# VERMONT YANKEE NUCLEAR POWER CORP. *v.* NATURAL RESOURCES DEFENSE COUNCIL, INC., ET AL.

No. 76–419.   Argued November 28, 1977—Decided April 3, 1978*

---

*Together with No. 76–528, *Consumers Power Co.* v. *Aeschliman et al.*, also on certiorari to the same court.

520

Rehnquist, J., delivered the opinion of the Court, in which all other Members joined except Blackmun and Powell, JJ., who took no part in the consideration or decision of the cases.

*Thomas G. Dignan, Jr.,* argued the cause for petitioner in No. 76–419. With him on the briefs were *G. Marshall Moriarty, William L. Patton,* and *R. K. Gad III. Charles A. Horsky* argued the cause for petitioner in No. 76–528. With him on the briefs was *Harold F. Reis.*

*Deputy Solicitor General Wallace* argued the cause for the federal respondents in support of petitioners in both cases pursuant to this Court's Rule 21 (4). On the briefs were *Solicitor General McCree, Acting Assistant Attorney General Liotta, Harriet S. Shapiro, Edmund B. Clark, John J. Zimmerman, Peter L. Strauss,* and *Stephen F. Eilperin. Henry V. Nickel* and *George C. Freeman, Jr.,* filed a brief for respondents Baltimore Gas & Electric Co. et al. in support of petitioner in No. 76–419 pursuant to Rule 21 (4).

*Richard E. Ayres* argued the cause and filed briefs for respondents in No. 76–419. *Myron M. Cherry* argued the cause for the nonfederal respondents in No. 76–528. With him on the brief was *Peter A. Flynn.*†

---

†Briefs of *amici curiae* urging reversal were filed by *Cameron F. MacRae, Leonard M. Trosten,* and *Harry H. Voigt* for Edison Electric Institute et al. in No. 76–419; by *Leonard J. Theberge, John M. Cannon, Edward H. Dowd,* and *L. Manning Muntzing* for Hans A. Bethe et al. in No. 76–528; and by *Max Dean* and *David S. Heller* for the U. S. Labor Party in No. 76–528.

*Louis J. Lefkowitz,* Attorney General of New York, *Samuel A. Hirshowitz,* First Assistant Attorney General, *Philip Weinberg* and *John F. Shea III,* Assistant Attorneys General; *Cabanne Howard,* Assistant Attorney General of Maine; and *Ellyn Weiss,* Assistant Attorney General of Massachusetts, filed a brief for 24 named States as *amici curiae* urging affirmance in both cases, joined by officials for their respective States as follows: *William J. Baxley,* Attorney General of Alabama, and *Henry H. Caddell,* Assistant Attorney General; *Richard R. Wier, Jr.,* Attorney General of Delaware, and *June D. MacArtor,* Deputy Attorney General; *Robert L. Shevin,* Attorney General of Florida, and *Marty Friedman,* Assistant Attorney General; *Arthur K. Bolton,* Attorney General of Georgia, and *Robert Bomar,* Senior Assistant Attorney General; *William J. Scott,* Attorney General of Illinois, and *Richard W. Cosby,* Assistant

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

In 1946, Congress enacted the Administrative Procedure Act, which as we have noted elsewhere was not only "a new, basic and comprehensive regulation of procedures in many agencies," *Wong Yang Sung* v. *McGrath,* 339 U. S. 33 (1950), but was also a legislative enactment which settled "long-continued and hard-fought contentions, and enacts a formula upon which opposing social and political forces have come to rest." *Id.,* at 40. Section 4 of the Act, 5 U. S. C. § 553 (1976 ed.), dealing with rulemaking, requires in subsection (b) that

Attorney General; *Curt T. Schneider,* Attorney General of Kansas, and *William Griffin,* Assistant Attorney General; *Robert F. Stephens,* Attorney General of Kentucky, and *David Short,* Assistant Attorney General; *William J. Guste,* Attorney General of Louisiana, and *Richard M. Troy,* Assistant Attorney General; *Joseph E. Brennan,* Attorney General of Maine; *Francis B. Burch,* Attorney General of Maryland,. and *Warren K. Rich,* Assistant Attorney General; *Francis X. Bellotti,* Attorney General of Massachusetts; *Frank J. Kelley,* Attorney General of Michigan, and *Stewart H. Freeman,* Assistant Attorney General; *Warren R. Spannaus,* Attorney General of Minnesota, and *Jocelyn F. Olson,* Assistant Attorney General; *John Ashcroft,* Attorney General of Missouri, and *Robert H. Lindholm,* Assistant Attorney General; *Toney Anaya,* Attorney General of New Mexico, and *James Huber,* Assistant Attorney General; *Rufus L. Edmisten,* Attorney General of North Carolina, and *Dan Oakley,* Assistant Attorney General; *William J. Brown,* Attorney General of Ohio, and *David Northrup,* Assistant Attorney General; *James A. Redden,* Attorney General of Oregon, and *Richard M. Sandvik,* Assistant Attorney General; *Robert P. Kane,* Attorney General of Pennsylvania, and *Douglas Blazey,* Assistant Attorney General; *John L. Hill,* Attorney General of Texas, and *Troy C. Webb* and *Paul G. Gosselink,* Assistant Attorneys General; *Robert B. Hansen,* Attorney General of Utah, and *William C. Quigley; M. Jerome Diamond,* Attorney General of Vermont, and *Benson D. Scotch,* Assistant Attorney General; and *Bronson C. LaFollette,* Attorney General of Wisconsisn, and *John E. Kofron,* Assistant Attorney General. *George C. Deptula* and *James N. Barnes* filed a brief for the Union of Concerned Scientists Fund, Inc., as *amicus curiae* urging affirmance in No. 76–419.

*Ronald A. Zumbrun, Raymond M. Momboisse, Robert K. Best, Albert Ferri, Jr.,* and *W. Hugh O'Riordan* filed a brief for the Pacific Legal Foundation as *amicus curiae* in both cases.

"notice of proposed rule making shall be published in the Federal Register . . . ," describes the contents of that notice, and goes on to require in subsection (c) that after the notice the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." Interpreting this provision of the Act in *United States* v. *Allegheny-Ludlum Steel Corp.*, 406 U. S. 742 (1972), and *United States* v. *Florida East Coast R. Co.*, 410 U. S. 224 (1973), we held that generally speaking this section of the Act established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures.[1] Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them. This is not to say necessarily that there are no circumstances which would ever justify a court in overturning agency action because of a failure to employ procedures beyond those required by the statute. But such circumstances, if they exist, are extremely rare.

Even apart from the Administrative Procedure Act this Court has for more than four decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments. In *FCC* v. *Schreiber*, 381 U. S. 279, 290 (1965), the Court explicated

---

[1] While there was division in this Court in *United States* v. *Florida East Coast R. Co.* with respect to the constitutionality of such an interpretation in a case involving ratemaking, which Mr. Justice Douglas and MR. JUSTICE STEWART felt was "adjudicatory" within the terms of the Act, the cases in the Court of Appeals for the District of Columbia Circuit which we review here involve rulemaking procedures in their most pristine sense.

this principle, describing it as "an outgrowth of the congressional determination that administrative agencies and administrators will be familiar with the industries which they regulate and will be in a better position than federal courts or Congress itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved." The Court there relied on its earlier case of *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 138 (1940), where it had stated that a provision dealing with the conduct of business by the Federal Communications Commission delegated to the Commission the power to resolve "subordinate questions of procedure . . . [such as] the scope of the inquiry, whether applications should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions."

It is in the light of this background of statutory and decisional law that we granted certiorari to review two judgments of the Court of Appeals for the District of Columbia Circuit because of our concern that they had seriously misread or misapplied this statutory and decisional law cautioning reviewing courts against engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress. 429 U. S. 1090 (1977). We conclude that the Court of Appeals has done just that in these cases, and we therefore remand them to it for further proceedings. We also find it necessary to examine the Court of Appeals' decision with respect to agency action taken after full adjudicatory hearings. We again conclude that the court improperly intruded into the agency's decisionmaking process, making it necessary for us to reverse and remand with respect to this part of the cases also.

I

A

Under the Atomic Energy Act of 1954, 68 Stat. 919, as amended, 42 U. S. C. § 2011 *et seq.*, the Atomic Energy Com-

mission [2] was given broad regulatory authority over the development of nuclear energy. Under the terms of the Act, a utility seeking to construct and operate a nuclear power plant must obtain a separate permit or license at both the construction and the operation stage of the project. See 42 U. S. C. §§ 2133, 2232, 2235, 2239. In order to obtain the construction permit, the utility must file a preliminary safety analysis report, an environmental report, and certain information regarding the antitrust implications of the proposed project. See 10 CFR §§ 2.101, 50.30 (f), 50.33a, 50.34 (a) (1977). This application then undergoes exhaustive review by the Commission's staff and by the Advisory Committee on Reactor Safeguards (ACRS), a group of distinguished experts in the field of atomic energy. Both groups submit to the Commission their own evaluations, which then become part of the record of the utility's application. [3] See 42 U. S. C. §§ 2039, 2232 (b). The Commission staff also undertakes the review required by the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. § 4321 et seq., and prepares a draft environmental impact statement, which, after being circulated for comment, 10 CFR §§ 51.22–51.25 (1977), is revised and becomes a final environmental impact statement. § 51.26. Thereupon a three-member Atomic Safety and Licensing Board conducts a public adjudicatory hearing, 42 U. S. C. § 2241, and reaches a decision [4] which can be

---

[2] The licensing and regulatory functions of the Atomic Energy Commission (AEC) were transferred to the Nuclear Regulatory Commission (NRC) by the Energy Reorganization Act of 1974, 42 U. S. C. § 5801 et seq. (1970 ed., Supp. V). Hereinafter both the AEC and NRC will be referred to as the Commission.

[3] ACRS is required to review each construction permit application for the purpose of informing the Commission of the "hazards of proposed or existing reactor facilities and the adequacy of proposed reactor safety standards." 42 U. S. C. § 2039.

[4] The Licensing Board issues a permit if it concludes that there is reasonable assurance that the proposed plant can be constructed and operated without undue risk, 42 U. S. C. § 2241; 10 CFR § 50.35 (a)

appealed to the Atomic Safety and Licensing Appeal Board, and currently, in the Commission's discretion, to the Commission itself. 10 CFR §§ 2.714, 2.721, 2.786, 2.787 (1977). The final agency decision may be appealed to the courts of appeals. 42 U. S. C. § 2239; 28 U. S. C. § 2342. The same sort of process occurs when the utility applies for a license to operate the plant, 10 CFR § 50.34 (b) (1977), except that a hearing need only be held in contested cases and may be limited to the matters in controversy. See 42 U. S. C. § 2239 (a); 10 CFR § 2.105 (1977); 10 CFR pt. 2, App. A, V (f) (1977).[5]

These cases arise from two separate decisions of the Court of Appeals for the District of Columbia Circuit. In the first, the court remanded a decision of the Commission to grant a license to petitioner Vermont Yankee Nuclear Power Corp. to operate a nuclear power plant. *Natural Resources Defense Council* v. *NRC*, 178 U. S. App. D. C. 336, 547 F. 2d 633 (1976). In the second, the court remanded a decision of that same agency to grant a permit to petitioner Consumers Power Co. to construct two pressurized water nuclear reactors to generate electricity and steam. *Aeschliman* v. *NRC*, 178 U. S. App. D. C. 325, 547 F. 2d 622 (1976).

### B

In December 1967, after the mandatory adjudicatory hearing and necessary review, the Commission granted petitioner Vermont Yankee a permit to build a nuclear power plant in Vernon, Vt. See 4 A. E. C. 36 (1967). Thereafter, Vermont Yankee applied for an operating license. Respondent Natural Resources Defense Council (NRDC) objected to the granting

---

(1977), and that the environmental cost-benefit balance favors the issuance of a permit.

[5] When a license application is contested, the Licensing Board must find reasonable assurance that the plant can be operated without undue risk and will not be inimical to the common defense and security or to the health and safety of the public. See 42 U. S. C. § 2232 (a); 10 CFR § 50.57 (a) (1977). The Licensing Board's decision is subject to review similar to that afforded the Board's decision with respect to a construction permit.

of a license, however, and therefore a hearing on the application commenced on August 10, 1971. Excluded from consideration at the hearings, over NRDC's objection, was the issue of the environmental effects of operations to reprocess fuel or dispose of wastes resulting from the reprocessing operations.[6] This ruling was affirmed by the Appeal Board in June 1972.

In November 1972, however, the Commission, making specific reference to the Appeal Board's decision with respect to the Vermont Yankee license, instituted rulemaking proceedings "that would specifically deal with the question of consideration of environmental effects associated with the uranium fuel cycle in the individual cost-benefit analyses for light water cooled nuclear power reactors." App. 352.' The notice of proposed rulemaking offered two alternatives, both predicated on a report prepared by the Commission's staff entitled Environmental Survey of the Nuclear Fuel Cycle. The first would have required no quantitative evaluation of the environmental hazards of fuel reprocessing or disposal because the Environmental Survey had found them to be slight. The second would have specified numerical values for the environmental impact of this part of the fuel cycle, which values would then be incorporated into a table, along with the other relevant factors, to determine the overall cost-benefit balance for each operating license. See id., at 356–357.

Much of the controversy in this case revolves around the

---

[6] The nuclear fission which takes place in light-water nuclear reactors apparently converts its principal fuel, uranium, into plutonium, which is itself highly radioactive but can be used as reactor fuel if separated from the remaining uranium and radioactive waste products. Fuel reprocessing refers to the process necessary to recapture usable plutonium. Waste disposal, at the present stage of technological development, refers to the storage of the very long lived and highly radioactive waste products until they detoxify sufficiently that they no longer present an environmental hazard. There are presently no physical or chemical steps which render this waste less toxic, other than simply the passage of time.

procedures used in the rulemaking hearing which commenced in February 1973. In a supplemental notice of hearing the Commission indicated that while discovery or cross-examination would not be utilized, the Environmental Survey would be available to the public before the hearing along with the extensive background documents cited therein. All participants would be given a reasonable opportunity to present their position and could be represented by counsel if they so desired. Written and, time permitting, oral statements would be received and incorporated into the record. All persons giving oral statements would be subject to questioning by the Commission. At the conclusion of the hearing, a transcript would be made available to the public and the record would remain open for 30 days to allow the filing of supplemental written statements. See generally *id.*, at 361–363. More than 40 individuals and organizations representing a wide variety of interests submitted written comments. On January 17, 1973, the Licensing Board held a planning session to schedule the appearance of witnesses and to discuss methods for compiling a record. The hearing was held on February 1 and 2, with participation by a number of groups, including the Commission's staff, the United States Environmental Protection Agency, a manufacturer of reactor equipment, a trade association from the nuclear industry, a group of electric utility companies, and a group called Consolidated National Intervenors which represented 79 groups and individuals including respondent NRDC.

After the hearing, the Commission's staff filed a supplemental document for the purpose of clarifying and revising the Environmental Survey. Then the Licensing Board forwarded its report to the Commission without rendering any decision. The Licensing Board identified as the principal procedural question the propriety of declining to use full formal adjudicatory procedures. The major substantive issue was the technical adequacy of the Environmental Survey.

In April 1974, the Commission issued a rule which adopted the second of the two proposed alternatives described above. The Commission also approved the procedures used at the hearing,[7] and indicated that the record, including the Environmental Survey, provided an "adequate data base for the regulation adopted." *Id.*, at 392. Finally, the Commission ruled that to the extent the rule differed from the Appeal Board decisions in Vermont Yankee "those decisions have no further precedential significance," *id.*, at 386, but that since "the environmental effects of the uranium fuel cycle have been shown to be relatively insignificant, . . . it is unnecessary to apply the amendment to applicant's environmental reports submitted prior to its effective date or to Final Environmental Statements for which Draft Environmental Statements have been circulated for comment prior to the effective date," *id.*, at 395.

Respondents appealed from both the Commission's adoption of the rule and its decision to grant Vermont Yankee's license to the Court of Appeals for the District of Columbia Circuit.

## C

In January 1969, petitioner Consumers Power Co. applied for a permit to construct two nuclear reactors in Midland,

---

[7] The Commission stated:

"In our view, the procedures adopted provide a more than adequate basis for formulation of the rule we adopted. All parties were fully heard. Nothing offered was excluded. The record does not indicate that any evidentiary material would have been received under different procedures. Nor did the proponent of the strict 'adjudicatory' approach make an offer of proof—or even remotely suggest—what substantive matters it would develop under different procedures. In addition, we note that 11 documents including the Survey were available to the parties several weeks before the hearing, and the Regulatory staff, though not requested to do so, made available various drafts and handwritten notes. Under all of the circumstances, we conclude that adjudicatory type procedures were not warranted here." App. 389–390 (footnote omitted).

Mich. Consumers Power's application was examined by the Commission's staff and the ACRS. The ACRS issued reports which discussed specific problems and recommended solutions. It also made reference to "other problems" of a more generic nature and suggested that efforts should be made to resolve them with respect to these as well as all other projects.[8] Two groups, one called Saginaw and another called Mapleton, intervened and opposed the application.[9] Saginaw filed with the Board a number of environmental contentions, directed over 300 interrogatories to the ACRS, attempted to depose the chairman of the ACRS, and requested discovery of various ACRS documents. The Licensing Board denied the various discovery requests directed to the ACRS. Hearings were then held on numerous radiological health and safety issues.[10] Thereafter, the Commission's staff issued a draft

---

[8] The ACRS report as quoted, 178 U. S. App. D. C., at 333, 547 F. 2d, at 630, stated:

"Other problems related to large water reactors have been identified by the Regulatory Staff and the ACRS and cited in previous ACRS reports. The Committee believes that resolution of these items should apply equally to the Midland Plant Units 1 & 2.

"The Committee believes that the above items can be resolved during construction and that, if due consideration is given to these items, the nuclear units proposed for the Midland Plant can be constructed with reasonable assurance that they can be operated without undue risk to the health and safety of the public."

[9] Saginaw included the Saginaw Valley Nuclear Study Group, the Citizens Committee for Environmental Protection of Michigan, the United Automobile Workers International, and three other environmental groups. Mapleton included Nelson Aeschliman and five other residents of a community near the proposed plantsite. Mapleton did not raise any contentions relating to energy conservation.

[10] Pursuant to the regulations then in effect, the Licensing Board refused to consider most of the environmental issues in this first set of hearings. On the last day of those hearings, however, the Court of Appeals for the District of Columbia Circuit decided *Calvert Cliffs' Coordinating Comm.* v. *AEC,* 146 U. S. App. D. C. 33, 449 F. 2d 1109 (1971), which invalidated the Commission's NEPA regulations. One effect of that decision was to

environmental impact statement. Saginaw submitted 119
environmental contentions which were both comments on the
proposed draft statement and a statement of Saginaw's posi-
tion in the upcoming hearings. The staff revised the state-
ment and issued a final environmental statement in March
1972. Further hearings were then conducted during May
and June 1972. Saginaw, however, choosing not to appear
at or participate in these latter hearings, indicated that it had
"no conventional findings of fact to set forth" and had not
"chosen to search the record and respond to this proceeding
by submitting citations of matters which we believe were
proved or disproved." See App. 190 n. 9. But the Licensing
Board, recognizing its obligations to "independently consider
the final balance among conflicting environmental factors in
the record," nevertheless treated as contested those issues "as
to which intervenors introduced affirmative evidence or en-
gaged in substantial cross examination." *Id.*, at 205, 191.

At issue now are 17 of those 119 contentions which are
claimed to raise questions of "energy conservation." The
Licensing Board indicated that as far as appeared from the
record, the demand for the plant was made up of normal
industrial and residential use. *Id.*, at 207. It went on to state
that it was "beyond our province to inquire into whether
the customary uses being made of electricity in our society
are 'proper' or 'improper.'" *Ibid.* With respect to claims
that Consumers Power stimulated demand by its advertising
the Licensing Board indicated that "[n]o evidence was offered
on this point and absent some evidence that Applicant is
creating abnormal demand, the Board did not consider the

require that environmental matters be considered in pending proceedings,
including this one. Accordingly, the Commission revised its regulations and
then undertook an extensive environmental review of the proposed nuclear
plants, requiring Consumers Power to file a lengthy environmental report.
Thereafter the Commission's staff prepared the draft environmental impact
statement discussed in text.

question." *Id.*, at 207–208. The Licensing Board also failed to consider the environmental effects of fuel reprocessing or disposal of radioactive wastes. The Appeal Board ultimately affirmed the Licensing Board's grant of a construction permit and the Commission declined to further review the matter.

At just about the same time, the Council on Environmental Quality revised its regulations governing the preparation of environmental impact statements. 38 Fed. Reg. 20550 (1973). The regulations mentioned for the first time the necessity of considering in impact statements energy conservation as one of the alternatives to a proposed project. The new guidelines were to apply only to final impact statements filed after January 28, 1974. *Id.*, at 20557. Thereafter, on November 6, 1973, more than a year after the record had been closed in the *Consumers Power* case and while that case was pending before the Court of Appeals, the Commission ruled in another case that while its statutory power to compel conservation was not clear, it did not follow that all evidence of energy conservation issues should therefore be barred at the threshold. *In re Niagara Mohawk Power Corp.*, 6 A. E. C. 995 (1973). Saginaw then moved the Commission to clarify its ruling and reopen the *Consumers Power* proceedings.

In a lengthy opinion, the Commission declined to reopen the proceedings. The Commission first ruled it was required to consider only energy conservation alternatives which were " 'reasonably available,' " would in their aggregate effect curtail demand for electricity to a level at which the proposed facility would not be needed, and were susceptible of a reasonable degree of proof. App. 332. It then determined, after a thorough examination of the record, that not all of Saginaw's contentions met these threshold tests. *Id.*, at 334–340. It further determined that the Board had been willing at all times to take evidence on the other contentions. Saginaw had simply failed to present any such evidence. The

Commission further criticized Saginaw for its total disregard of even those minimal procedural formalities necessary to give the Board some idea of exactly what was at issue. The Commission emphasized that "[p]articularly in these circumstances, Saginaw's complaint that it was not granted a hearing on alleged energy conservation issues comes with ill grace." [11] *Id.*, at 342. And in response to Saginaw's contention that regardless of whether it properly raised the issues, the Licensing Board must consider all environmental issues, the Commission basically agreed, as did the Board itself, but further reasoned that the Board must have some workable procedural rules and these rules

> "in this setting must take into account that energy conservation is a novel and evolving concept. NEPA 'does not require a "crystal ball" inquiry.' *Natural Resources Defense Council* v. *Morton*, [148 U. S. App. D. C. 5, 15, 458 F. 2d 827, 837 (1972)]. This consideration has led us to hold that we will not apply *Niagara* retroactively. As we gain experience on a case-by-case basis and hopefully, feasible energy conservation techniques emerge, the applicant, staff, and licensing boards will have obligations to develop an adequate record on these issues in appropriate cases, whether or not they are raised by intervenors.
>
> "However, at this emergent stage of energy conservation principles, intervenors also have their responsibilities. They must state clear and reasonably specific energy conservation contentions in a timely fashion. Beyond that, they have a burden of coming forward with some

---

[11] The Licensing Board had highlighted this same problem in its initial decision, noting "that the failure to propose proper findings and conclusions has greatly complicated the task of the Board and has made it virtually impossible in some instances to know whether particular issues are in fact contested." App. 190 n. 10. The Appeal Board was even less charitable, noting that that "[p]articipation in this manner, in our opinion, subverts the entire adjudicatory process." *Id.*, at 257.

affirmative showing if they wish to have these novel contentions explored further." [12]  *Id.*, at 344 (footnotes omitted).

Respondents then challenged the granting of the construction permit in the Court of Appeals for the District of Columbia Circuit.

D

With respect to the challenge of Vermont Yankee's license, the court first ruled that in the absence of effective rulemaking proceedings,[13] the Commission must deal with the environmental impact of fuel reprocessing and disposal in individual licensing proceedings. 178 U. S. App. D. C., at 344, 547 F. 2d, at 641. The court then examined the rulemaking proceedings and, despite the fact that it appeared that the agency employed all the procedures required by 5 U. S. C. § 553 (1976 ed.) and more, the court determined the proceedings to be inadequate and overturned the rule. Accordingly, the Commission's determination with respect to Vermont Yankee's license was also remanded for further proceedings.[14]  178 U. S. App. D. C., at 358, 547 F. 2d, at 655.

---

[12] In what was essentially dictum, the Commission also ruled, after considering the various relevant factors—such as the extent to which the new rule represents a departure from prior practice, the degree of reliance on past practice and consequent burdens imposed by retroactive application of the rule—that the rule enunciated in *Niagara* should not be applied retroactively to cases which had progressed to final order and issuance of construction permits before *Niagara* was decided. App. 337.

[13] In the Court of Appeals no one questioned the Commission's authority to deal with fuel cycle issues by informal rulemaking as opposed to adjudication. 178 U. S. App. D. C., at 345–346, 547 F. 2d, at 642–643. Neither does anyone seriously question before this Court the Commission's authority in this respect.

[14] After the decision of the Court of Appeals the Commission promulgated a new interim rule pending issuance of a final rule. 42 Fed. Reg. 13803 (1977). See *Vermont Yankee Nuclear Power Corp.*, 5 N. R. C. 717

With respect to the permit to Consumers Power, the court first held that the environmental impact statement for construction of the Midland reactors was fatally defective for

(1977). The Commission then, at the request of the New England Coalition on Nuclear Pollution, applied the interim rule to Vermont Yankee and determined that the cost-benefit analysis was still in the plant's favor. *Vermont Yankee Nuclear Power Corp.*, 6 N. R. C. 25 (1977). That decision is presently on appeal to the Court of Appeals for the First Circuit. The Commission has also indicated in its brief that it intends to complete the proceedings currently in progress looking toward the adoption of a final rule regardless of the outcome of this case. Brief for Federal Respondents 37 n. 36. Following oral argument, respondent NRDC, relying on the above facts, filed a suggestion of mootness and a motion to dismiss the writ of certiorari as improvidently granted. We hold that the case is not moot, and deny the motion to dismiss the writ of certiorari as improvidently granted.

Upon remand, the majority of the panel of the Court of Appeals is entirely free to agree or disagree with Judge Tamm's conclusion that the rule pertaining to the back end of the fuel cycle under which petitioner Vermont Yankee's license was considered is arbitrary and capricious within the meaning of § 10 (e) of the Administrative Procedure Act, 5 U. S. C. § 706 (1976 ed.), even though it may not hold, as it did in its previous opinion, that the rule is invalid because of the inadequacy of the agency procedures. Should it hold the rule invalid, it appears in all probability that the Commission will proceed to promulgate a rule resulting from rulemaking proceedings currently in progress. Brief for Federal Respondents 37 n. 36. In all likelihood the Commission would then be required, under the compulsion of the court's order, to examine Vermont Yankee's license under that new rule.

If, on the other hand, a majority of the Court of Appeals should decide that it was unwilling to hold the rule in question arbitrary and capricious merely on the basis of § 10 (e) of the Administrative Procedure Act, Vermont Yankee would not necessarily be required to have its license reevaluated. So far as petitioner Vermont Yankee is concerned, there is certainly a case or controversy in this Court with respect to whether it must, by virtue of the Court of Appeals' decision, submit its license to the Commission for reevaluation and possible revocation under a new rule. It is true that we do not finally determine here the validity of the rule upon which the validity of Vermont Yankee's license in turn depends. Neither should

failure to examine energy conservation as an alternative to a plant of this size. 178 U. S. App. D. C., at 331, 547 F. 2d, at 628. The court also thought the report by ACRS was inadequate, although it did not agree that discovery from individual ACRS members was the proper way to obtain further explication of the report. Instead, the court held that the Commission should have *sua sponte* sent the report back to the ACRS for further elucidation of the "other problems" and their resolution. *Id.,* at 335, 547 F. 2d, at 632. Finally, the court ruled that the fuel cycle issues in this case were controlled by *NRDC* v. *NRC,* discussed above, and remanded for appropriate consideration of waste disposal and other unaddressed fuel cycle issues as described in that opinion. 178 U. S. App. D. C., at 335, 547 F. 2d, at 632.

---

anything we say today be taken as a limitation on the Court of Appeals' discretion to take due account, if appropriate, of any additions made to the record by the Commission or to consolidate this appeal with the appeal from the interim rulemaking proceeding which is already pending. But the fact that the question of the validity of the first rule remains open upon remand makes the controversy no less "live."

As we read the opinion of the Court of Appeals, its view that reviewing courts may in the absence of special circumstances justifying such a course of action impose additional procedural requirements on agency action raises questions of such significance in this area of the law as to warrant our granting certiorari and deciding the case. Since the vast majority of challenges to administrative agency action are brought to the Court of Appeals for the District of Columbia Circuit, the decision of that court in this case will serve as precedent for many more proceedings for judicial review of agency actions than would the decision of another Court of Appeals. Finally, this decision will continue to play a major role in the instant litigation regardless of the Commission's decision to press ahead with further rulemaking proceedings. As we note in n. 15, *infra,* not only is the NRDC relying on the decision of the Court of Appeals as a device to force the agency to provide more procedures, but it is also challenging the interim rules promulgated by the agency in the Court of Appeals, alleging again the inadequacy of the procedures and citing the opinion of the Court of Appeals as binding precedent to that effect.

## II

### A

Petitioner Vermont Yankee first argues that the Commission may grant a license to operate a nuclear reactor without any consideration of waste disposal and fuel reprocessing. We find, however, that this issue is no longer presented by the record in this case. The Commission does not contend that it is not required to consider the environmental impact of the spent fuel processes when licensing nuclear power plants. Indeed, the Commission has publicly stated subsequent to the Court of Appeals' decision in the instant case that consideration of the environmental impact of the back end of the fuel cycle in "the environmental impact statements for individual LWR's [light-water power reactors] would represent a full and candid assessment of costs and benefits consistent with the legal requirements and spirit of NEPA." 41 Fed. Reg. 45849 (1976). Even prior to the Court of Appeals' decision the Commission implicitly agreed that it would consider the back end of the fuel cycle in all licensing proceedings: It indicated that it was not necessary to reopen prior licensing proceedings because "the environmental effects of the uranium fuel cycle have been shown to be relatively insignificant," and thus incorporation of those effects into the cost-benefit analysis would not change the results of such licensing proceedings. App. 395. Thus, at this stage of the proceedings the only question presented for review in this regard is whether the Commission may consider the environmental impact of the fuel processes when licensing nuclear reactors. In addition to the weight which normally attaches to the agency's determination of such a question, other reasons support the Commission's conclusion.

Vermont Yankee will produce annually well over 100 pounds of radioactive wastes, some of which will be highly toxic. The Commission itself, in a pamphlet published by its

information office, clearly recognizes that these wastes "pose the most severe potential health hazard . . . ." U. S. Atomic Energy Commission, Radioactive Wastes 12 (1965). Many of these substances must be isolated for anywhere from 600 to hundreds of thousands of years. It is hard to argue that these wastes do not constitute "adverse environmental effects which cannot be avoided should the proposal be implemented," or that by operating nuclear power plants we are not making "irreversible and irretrievable commitments of resources." 42 U. S. C. §§ 4332 (2)(C)(ii), (v). As the Court of Appeals recognized, the environmental impact of the radioactive wastes produced by a nuclear power plant is analytically indistinguishable from the environmental effects of "the stack gases produced by a coal-burning power plant." 178 U. S. App. D. C., at 341, 547 F. 2d, at 638. For these reasons we hold that the Commission acted well within its statutory authority when it considered the back end of the fuel cycle in individual licensing proceedings.

B

We next turn to the invalidation of the fuel cycle rule. But before determining whether the Court of Appeals reached a permissible result, we must determine exactly what result it did reach, and in this case that is no mean feat. Vermont Yankee argues that the court invalidated the rule because of the inadequacy of the procedures employed in the proceedings. Brief for Petitioner in No. 76–419, pp. 30–38. Respondents, on the other hand, labeling petitioner's view of the decision a "straw man," argue to this Court that the court merely held that the record was inadequate to enable the reviewing court to determine whether the agency had fulfilled its statutory obligation. Brief for Respondents in No. 76–419, pp. 28–30, 40. But we unfortunately have not found the parties' characterization of the opinion to be entirely reliable; it appears here, as in *Orloff* v. *Willoughby,* 345 U. S. 83, 87 (1953), that

"in this Court the parties changed positions as nimbly as if dancing a quadrille." [15]

After a thorough examination of the opinion itself, we con-

---

[15] Vermont Yankee's interpretation has been consistent throughout the litigation. That cannot be said of the other parties, however. The Government, Janus-like, initially took both positions. While the petition for certiorari was pending, a brief was filed on behalf of the United States and the Commission, with the former indicating that it believed the court had unanimously held the record to be inadequate, while the latter took Vermont Yankee's view of the matter. See Brief for Federal Respondents 5–9 (filed Jan. 10, 1977). When announcing its intention to undertake licensing of reactors pending the promulgation of an "interim" fuel cycle rule, however, the Commission, said:

"[T]he court found that the rule was inadequately supported by the record insofar as it treated two particular aspects of the fuel cycle—the impacts from reprocessing of spent fuel and the impacts from radioactive waste management." 41 Fed. Reg. 45850 (1976).

And even more recently, in opening another rulemaking proceeding to replace the rule overturned by the Court of Appeals, the Commission stated:

"The original procedures proved adequate for the development and illumination of a wide range of fuel cycle impact issues . . . .

". . . The court here indicated that the procedures previously employed could suffice, and indeed did for other issues.

.            .            .            .            .

"Accordingly, notice is hereby given that the rules for the conduct of the reopened hearing and the authorities and responsibilities of the Hearing Board will be the same as originally applied in this matter (38 Fed. Reg. 49, January 3, 1973) except that specific provision is hereby made for the Hearing Board to entertain suggestions from participants as to questions which the Board should ask of witnesses for other participants." 42 Fed. Reg. 26988–26989 (1977).

Respondent NRDC likewise happily switches sides depending on the forum. As indicated above, it argues here that the Court of Appeals held only that the record was inadequate. Almost immediately after the Court of Appeals rendered its decision, however, NRDC filed a petition for rulemaking with the Commission which listed over 13 pages of procedural suggestions it thought "necessary to comply with the Court's order and with the mandate of [NEPA]." NRDC, Petition for Rulemaking, NRC

clude that while the matter is not entirely free from doubt, the majority of the Court of Appeals struck down the rule because of the perceived inadequacies of the procedures employed in the rulemaking proceedings. The court first determined the intervenors' primary argument to be "that the decision to preclude 'discovery or cross-examination' denied them a meaningful opportunity to participate in the proceedings as guaranteed by due process." 178 U. S. App. D. C., at 346, 547 F. 2d, at 643. The court then went on to frame the issue for decision thus:

> "Thus, we are called upon to decide whether the procedures provided by the agency were sufficient to ventilate the issues." *Ibid.*, 547 F. 2d, at 643.

The court conceded that absent extraordinary circumstances it is improper for a reviewing court to prescribe the procedural format an agency must follow, but it likewise clearly thought it entirely appropriate to "scrutinize the record as a whole to insure that genuine opportunities to participate in a meaningful way were provided . . . ." *Id.*, at 347, 547 F. 2d, at 644. The court also refrained from actually ordering the agency to follow any specific procedures, *id.*, at 356–357, 547 F. 2d, at 653–654, but there is little doubt in our minds that

Docket No. RM–50–3 (Aug. 10, 1976). These proposals include cross-examination, discovery, and subpoena power. *Id.*, Attachment, Rules for Conduct of Hearing on Environmental Effects of the Uranium Fuel Cycle, ¶¶ 5 (a), 9 (b), 11. NRDC likewise challenged the interim fuel cycle rule and suggested to the Court of Appeals that it hold the case pending our decision in this case because the interim rules were "defective due to the inadequacy of the procedures used in developing the rule . . . ." Motion to Hold Petition for Review in Abeyance 1, in *NRDC* v. *NRC*, No. 77–1448 (DC Cir., petition for review filed May 13, 1977; motion filed July 5, 1977). NRDC has likewise challenged the procedures being used in the final rulemaking proceeding as being "no more than a re-run of hearing procedures which were found inadequate [by the Court of Appeals]." · NRDC Petition for Reconsideration of the Ruling Reopening the Hearings on the Environmental Effects of the Uranium Fuel Cycle 10, NRC Docket No. RM–50–3 (June 6, 1977).

the ineluctable mandate of the court's decision is that the procedures afforded during the hearings were inadequate. This conclusion is particularly buttressed by the fact that after the court examined the record, particularly the testimony of Dr. Pittman, and declared it insufficient, the court proceeded to discuss at some length the necessity for further procedural devices or a more "sensitive" application of those devices employed during the proceedings. *Ibid.* The exploration of the record and the statement regarding its insufficiency might initially lead one to conclude that the court was only examining the sufficiency of the evidence, but the remaining portions of the opinion dispel any doubt that this was certainly not the sole or even the principal basis of the decision. Accordingly, we feel compelled to address the opinion on its own terms, and we conclude that it was wrong.

In prior opinions we have intimated that even in a rulemaking proceeding when an agency is making a " 'quasi-judicial' " determination by which a very small number of persons are " 'exceptionally affected, in each case upon individual grounds,' " in some circumstances additional procedures may be required in order to afford the aggrieved individuals due process.[16] *United States* v. *Florida East Coast R. Co.,* 410 U. S., at 242, 245, quoting from *Bi-Metallic Investment Co.* v. *State Board of Equalization,* 239 U. S. 441, 446 (1915). It might also be true, although we do not think the issue is presented in this case and accordingly do not decide it, that a totally unjustified departure from well-settled agency procedures of long standing might require judicial correction.[17]

---

[16] Respondent NRDC does not now argue that additional procedural devices were required under the Constitution. Since this was clearly a rulemaking proceeding in its purest form, we see nothing to support such a view. See *United States* v. *Florida East Coast R. Co.,* 410 U. S. 224, 244–245 (1973); *Bowles* v. *Willingham,* 321 U. S. 503 (1944); *Bi-Metallic Investment Co.* v. *State Board of Equalization,* 239 U. S. 441 (1915).

[17] NRDC argues that the agency has in the past provided more than the minimum procedures specified in § 4 of the APA and therefore something

But this much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances the "administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" *FCC* v. *Schreiber*, 381 U. S., at 290, quoting from *FCC* v. *Pottsville*

---

more is required here, since "[a]gencies are not free to alter their procedures on a whim, grossly constricting parties' procedural rights when it deems them an impediment or embarrassment to implementing its own views." Brief for Respondents in No. 76-419, p. 46. In support NRDC first argues that the Commission has considered other equally generic issues in adjudicatory proceedings. But NRDC conceded in the court below that the agency could promulgate rules regarding the fuel cycle in rulemaking proceedings. 178 U. S. App. D. C., at 346, 547 F. 2d, at 643. Moreover, even here it concedes "that the Commission has in the past chosen to consider both environmental and safety issues that would ordinarily be addressed in adjudicatory licensing proceedings through 'generic' rulemaking, a practice with which the lower court did not take issue." Brief for Respondents in No. 76-419, p. 48. It now contends, however, that the Commission provided more procedural safeguards in those rulemaking proceedings than in the proceeding presently under review. In support it cites three previous proceedings where cross-examination was supposedly provided. *Id.*, at 49 n. 69.

Pretermitting both the fact that the Court of Appeals in no way relied upon this argument in its decision and the question of whether courts can impose additional procedures even when an agency substantially departs from past practice, we find NRDC's argument without merit. In the first place, three proceedings out of the many held by NRC and its predecessor hardly establish the type of longstanding and well-established practice deviation from which might justify judicial intervention. It appears, moreover, that in fact the hearings cited by NRDC are not only not part of a longstanding practice but are themselves aberrational. Since 1970 the Commission has conducted a large number of rulemaking proceedings, some of which have involved matters of substantial importance, and almost none of which have involved cross-examination. See, *e. g.*, Quality Assurance Criteria for Nuclear Power Plants, 35 Fed. Reg. 10499 (1970); General Design Criteria for Nuclear Power Plants, 36 Fed. Reg. 3255 (1971); Pre-Construction Permit Activities, 39 Fed. Reg. 14506 (1974); Environmental Protection—Licensing and Regulatory Policy and Procedures. *Id.*, at 26279.

*Broadcasting Co.,* 309 U. S., at 143. Indeed, our cases could hardly be more explicit in this regard. The Court has, as we noted in *FCC* v. *Schreiber, supra,* at 290, and n. 17, upheld this principle in a variety of applications,[18] including that case where the District Court, instead of inquiring into the validity of the Federal Communications Commission's exercise of its rulemaking authority, devised procedures to be followed by the agency on the basis of its conception of how the public and private interest involved could best be served. Examining § 4 (j) of the Communications Act of 1934, the Court unanimously held that the Court of Appeals erred in upholding that action. And the basic reason for this decision was the Court of Appeals' serious departure from the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure.

We have continually repeated this theme through the years, most recently in *FPC* v. *Transcontinental Gas Pipe Line Corp.,* 423 U. S. 326 (1976), decided just two Terms ago. In that case, in determining the proper scope of judicial review of agency action under the Natural Gas Act, we held that while a court may have occasion to remand an agency decision because of the inadequacy of the record, the agency should normally be allowed to "exercise its administrative discretion in deciding how, in light of internal organization considerations, it may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops." *Id.,* at 333. We went on to emphasize:

"At least in the absence of substantial justification for doing otherwise, a reviewing court may not, after determining that additional evidence is requisite for adequate

---

[18] See, *e. g., CAB* v. *Hermann,* 353 U. S. 322 (1957); *Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186 (1946); *Wallace Corp.* v. *NLRB,* 323 U. S. 248 (1944); *Endicott Johnson Corp.* v. *Perkins,* 317 U. S. 501 (1943); *Utah Fuel Co.* v. *National Bituminous Coal Comm'n,* 306 U. S. 56 (1939); *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294 (1933).

review, proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry and ordering the results to be reported to the court without opportunity for further consideration on the basis of the new evidence by the agency. Such a procedure clearly runs the risk of 'propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.' *SEC* v. *Chenery Corp.,* 332 U. S. 194, 196 (1947)." *Ibid.*

Respondent NRDC argues that § 4 of the Administrative Procedure Act, 5 U. S. C. § 553 (1976 ed.), merely establishes lower procedural bounds and that a court may routinely require more than the minimum when an agency's proposed rule addresses complex or technical factual issues or "Issues of Great Public Import." Brief for Respondents in No. 76–419, p. 49. We have, however, previously shown that our decisions reject this view. *Supra,* at 542 to this page. We also think the legislative history, even the part which it cites, does not bear out its contention. The Senate Report explains what eventually became § 4 thus:

"This subsection states . . . the minimum requirements of public rule making procedure short of statutory hearing. Under it agencies might in addition confer with industry advisory committees, consult organizations, hold informal 'hearings,' and the like. Considerations of practicality, necessity, and public interest . . . will naturally govern the agency's determination of the extent to which public proceedings should go. Matters of great import, or those where the public submission of facts will be either useful to the agency or a protection to the public, should naturally be accorded more elaborate public procedures." S. Rep. No. 752, 79th Cong., 1st Sess., 14–15 (1945).

The House Report is in complete accord:

" '[U]niformity has been found possible and desirable for all classes of both equity and law actions in the courts . . . .

It would seem to require no argument to demonstrate that the administrative agencies, exercising but a fraction of the judicial power may likewise operate under uniform rules of practice and procedure and that they may be required to remain within the terms of the law as to the exercise of both quasi-legislative and quasi-judicial power.'

.        .        .        .        .

"The bill is an outline of minimum essential rights and procedures. . . . It affords private parties a means of knowing what their rights are and how they may protect them . . . .

.        .        .        .        .

". . . [The bill contains] the essentials of the different forms of administrative proceedings . . . ." H. R. Rep. No. 1980, 79th Cong., 2d Sess., 9, 16–17 (1946).

And the Attorney General's Manual on the Administrative Procedure Act 31, 35 (1947), a contemporaneous interpretation previously given some deference by this Court because of the role played by the Department of Justice in drafting the legislation,[19] further confirms that view. In short, all of this leaves little doubt that Congress intended that the discretion of the *agencies* and not that of the courts be exercised in determining when extra procedural devices should be employed.

There are compelling reasons for construing § 4 in this manner. In the first place, if courts continually review agency proceedings to determine whether the agency employed procedures which were, in the court's opinion, perfectly tailored to reach what the court perceives to be the "best" or "correct" result, judicial review would be totally unpredictable. And the agencies, operating under this vague injunction to employ

---

[19] See *Power Reactor Co. v. Electricians,* 367 U. S. 396, 408 (1961); *United States v. Zucca,* 351 U. S. 91, 96 (1956).

the "best" procedures and facing the threat of reversal if they did not, would undoubtedly adopt full adjudicatory procedures in every instance. Not only would this totally disrupt the statutory scheme, through which Congress enacted "a formula upon which opposing social and political forces have come to rest," *Wong Yang Sung* v. *McGrath,* 339 U. S., at 40, but all the inherent advantages of informal rulemaking would be totally lost.[20]

Secondly, it is obvious that the court in these cases reviewed the agency's choice of procedures on the basis of the record actually produced at the hearing, 178 U. S. App. D. C., at 347, 547 F. 2d, at 644, and not on the basis of the information available to the agency when it made the decision to structure the proceedings in a certain way. This sort of Monday morning quarterbacking not only encourages but almost compels the agency to conduct all rulemaking proceedings with the full panoply of procedural devices normally associated only with adjudicatory hearings.

Finally, and perhaps most importantly, this sort of review fundamentally misconceives the nature of the standard for judicial review of an agency rule. The court below uncritically assumed that additional procedures will automatically result in a more adequate record because it will give interested parties more of an opportunity to participate in and contribute to the proceedings. But informal rulemaking need not be based solely on the transcript of a hearing held before an agency. Indeed, the agency need not even hold a formal hearing. See 5 U. S. C. § 553 (c) (1976 ed.). Thus, the adequacy of the "record" in this type of proceeding is not correlated directly to the type of procedural devices employed, but rather turns on whether the agency has followed the statutory mandate of the Administrative Procedure Act or other relevant statutes. If the agency is compelled to sup-

---

[20] See Wright, The Courts and the Rulemaking Process: The Limits of Judicial Review, 59 Cornell L. Rev. 375, 387–388 (1974).

port the rule which it ultimately adopts with the type of record produced only after a full adjudicatory hearing, it simply will have no choice but to conduct a full adjudicatory hearing prior to promulgating every rule. In sum, this sort of unwarranted judicial examination of perceived procedural shortcomings of a rulemaking proceeding can do nothing but seriously interfere with that process prescribed by Congress.

Respondent NRDC also argues that the fact that the Commission's inquiry was undertaken in the context of NEPA somehow permits a court to require procedures beyond those specified in § 4 of the APA when investigating factual issues through rulemaking. The Court of Appeals was apparently also of this view, indicating that agencies may be required to "develop new procedures to accomplish the innovative task of implementing NEPA through rulemaking." 178 U. S. App. D. C., at 356, 547 F. 2d, at 653. But we search in vain for something in NEPA which would mandate such a result. We have before observed that "NEPA does not repeal by implication any other statute." *Aberdeen & Rockfish R. Co.* v. *SCRAP*, 422 U. S. 289, 319 (1975). See also *United States* v. *SCRAP*, 412 U. S. 669, 694 (1973). In fact, just two Terms ago, we emphasized that the only procedural requirements imposed by NEPA are those stated in the plain language of the Act. *Kleppe* v. *Sierra Club*, 427 U. S. 390, 405–406 (1976). Thus, it is clear NEPA cannot serve as the basis for a substantial revision of the carefully constructed procedural specifications of the APA.

In short, nothing in the APA, NEPA, the circumstances of this case, the nature of the issues being considered, past agency practice, or the statutory mandate under which the Commission operates permitted the court to review and overturn the rulemaking proceeding on the basis of the procedural devices employed (or not employed) by the Commission so long as the Commission employed at least the statutory *minima*, a matter about which there is no doubt in this case.

There remains, of course, the question of whether the challenged rule finds sufficient justification in the administrative proceedings that it should be upheld by the reviewing court. Judge Tamm, concurring in the result reached by the majority of the Court of Appeals, thought that it did not. There are also intimations in the majority opinion which suggest that the judges who joined it likewise may have thought the administrative proceedings an insufficient basis upon which to predicate the rule in question. We accordingly remand so that the Court of Appeals may review the rule as the Administrative Procedure Act provides. We have made it abundantly clear before that when there is a contemporaneous explanation of the agency decision, the validity of that action must "stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review. If that finding is not sustainable on the administrative record made, then the Comptroller's decision must be vacated and the matter remanded to him for further consideration." *Camp* v. *Pitts,* 411 U. S. 138, 143 (1973). See also *SEC* v. *Chenery Corp.,* 318 U. S. 80 (1943). The court should engage in this kind of review and not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are "best" or most likely to further some vague, undefined public good.[21]

### III

#### A

We now turn to the Court of Appeals' holding "that rejection of energy conservation on the basis of the 'threshold test'

---

[21] Of course, the court must determine whether the agency complied with the procedures mandated by the relevant statutes. *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 417 (1971). But, as we indicated above, there is little doubt that the agency was in full compliance with all the applicable requirements of the Administrative Procedure Act.

550

was capricious and arbitrary," 178 U. S. App. D. C., at 332, 547 F. 2d, at 629, and again conclude the court was wrong.

The Court of Appeals ruled that the Commission's "threshold test" for the presentation of energy conservation contentions was inconsistent with NEPA's basic mandate to the Commission. *Id.*, at 330, 547 F. 2d, at 627. The Commission, the court reasoned, is something more than an umpire who sits back and resolves adversary contentions at the hearing stage. *Ibid.*, 547 F. 2d, at 627. And when an intervenor's comments "bring 'sufficient attention to the issue to stimulate the Commission's consideration of it,' " the Commission must "undertake its own preliminary investigation of the proffered alternative sufficient to reach a rational judgment whether it is worthy of detailed consideration in the EIS. Moreover, the Commission must explain the basis for each conclusion that further consideration of a suggested alternative is unwarranted." *Id.*, at 331, 547 F. 2d, at 628, quoting from *Indiana & Michigan Electric Co.* v. *FPC*, 163 U. S. App. D. C. 334, 337, 502 F. 2d 336, 339 (1974), cert. denied, 420 U. S. 946 (1975).

While the court's rationale is not entirely unappealing as an abstract proposition, as applied to this case we think it basically misconceives not only the scope of the agency's statutory responsibility, but also the nature of the administrative process, the thrust of the agency's decision, and the type of issues the intervenors were trying to raise.

There is little doubt that under the Atomic Energy Act of 1954, state public utility commissions or similar bodies are empowered to make the initial decision regarding the need for power. 42 U. S. C. § 2021 (k). The Commission's prime area of concern in the licensing context, on the other hand, is national security, public health, and safety. §§ 2132, 2133, 2201. And it is clear that the need, as that term is conventionally used, for the power was thoroughly explored in the hearings. Even the Federal Power Commission, which regu-

lates sales in interstate commerce, 16 U. S. C. § 824 *et seq.* (1976 ed.), agreed with Consumers Power's analysis of projected need.   App. 207.

NEPA, of course, has altered slightly the statutory balance, requiring "a detailed statement by the responsible official on . . . alternatives to the proposed action."   42 U. S. C. § 4332 (C).   But, as should be obvious even upon a moment's reflection, the term "alternatives" is not self-defining. To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility.   As the Court of Appeals for the District of Columbia Circuit has itself recognized:

> "There is reason for concluding that NEPA was not meant to require detailed discussion of the environmental effects of 'alternatives' put forward in comments when these effects cannot be readily ascertained and the alternatives are deemed only remote and speculative possibilities, in view of basic changes required in statutes and policies of other agencies—making them available, if at all, only after protracted debate and litigation not meaningfully compatible with the time-frame of the needs to which the underlying proposal is addressed." *Natural Resources Defense Council* v. *Morton,* 148 U. S. App. D. C. 5, 15–16, 458 F. 2d 827, 837–838 (1972).

See also *Life of the Land* v. *Brinegar,* 485 F. 2d 460 (CA9 1973), cert. denied, 416 U. S. 961 (1974).   Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.  Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

With these principles in mind we now turn to the notion of "energy conservation," an alternative the omission of which was thought by the Court of Appeals to have been "forcefully pointed out by Saginaw in its comments on the draft EIS." 178 U. S. App. D. C., at 328, 547 F. 2d, at 625. Again, as the Commission pointed out, "the phrase 'energy conservation' has a deceptively simple ring in this context. Taken literally, the phrase suggests a virtually limitless range of possible actions and developments that might, in one way or another, ultimately reduce projected demands for electricity from a particular proposed plant." App. 331. Moreover, as a practical matter, it is hard to dispute the observation that it is largely the events of recent years that have emphasized not only the need but also a large variety of alternatives for energy conservation. Prior to the drastic oil shortages incurred by the United States in 1973, there was little serious thought in most Government circles of energy conservation alternatives. Indeed, the Council on Environmental Quality did not promulgate regulations which even remotely suggested the need to consider energy conservation in impact statements until August 1, 1973. See 40 CFR § 1500.8 (a) (4) (1977); 38 Fed. Reg. 20554 (1973). And even then the guidelines were not made applicable to draft and final statements filed with the Council before January 28, 1974. *Id.*, at 20557, 21265. The Federal Power Commission likewise did not require consideration of energy conservation in applications to build hydroelectric facilities until June 19, 1973. 18 CFR pt. 2, App. A., § 8.2 (1977); 38 Fed. Reg. 15946, 15949 (1973). And these regulations were not made retroactive either. *Id.*, at 15946. All this occurred over a year and a half after the draft environmental statement for Midland had been prepared, and over a year after the final environmental statement had been prepared and the hearings completed.

We think these facts amply demonstrate that the concept of "alternatives" is an evolving one, requiring the agency to

explore more or fewer alternatives as they become better known and understood. This was well understood by the Commission, which, unlike the Court of Appeals, recognized that the Licensing Board's decision had to be judged by the information then available to it. And judged in that light we have little doubt the Board's actions were well within the proper bounds of its statutory authority. Not only did the record before the agency give every indication that the project was actually needed, but also there was nothing before the Board to indicate to the contrary.

We also think the court's criticism of the Commission's "threshold test" displays a lack of understanding of the historical setting within which the agency action took place and of the nature of the test itself. In the first place, while it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions. This is especially true when the intervenors are requesting the agency to embark upon an exploration of uncharted territory, as was the question of energy conservation in the late 1960's and early 1970's.

"[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made . . . ; it must show why the mistake was of possible significance in the results . . . ." *Portland Cement Assn.* v. *Ruckelshaus,* 158 U. S. App. D. C. 308, 327, 486 F. 2d 375, 394 (1973), cert. denied *sub nom. Portland Cement Corp.* v. *Administrator, EPA,* 417 U. S. 921 (1974).

Indeed, administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making

cryptic and obscure reference to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented." In fact, here the agency continually invited further clarification of Saginaw's contentions. Even without such clarification it indicated a willingness to receive evidence on the matters. But not only did Saginaw decline to further focus its contentions, it virtually declined to participate, indicating that it had "no conventional findings of fact to set forth" and that it had not "chosen to search the record and respond to this proceeding by submitting citations of matter which we believe were proved or disproved."

We also think the court seriously mischaracterized the Commission's "threshold test" as placing "heavy substantive burdens . . . on intervenors . . . ." 178 U. S. App. D. C., at 330, and n. 11, 547 F. 2d, at 627, and n. 11. On the contrary, the Commission explicitly stated:

> "We do not equate this burden with the civil litigation concept of a *prima facie* case, an unduly heavy burden in this setting. But the showing should be sufficient to require reasonable minds to inquire further." App. 344 n. 27.

We think this sort of agency procedure well within the agency's discretion.

In sum, to characterize the actions of the Commission as "arbitrary or capricious" in light of the facts then available to it as described at length above, is to deprive those words of any meaning. As we have said in the past:

> "Administrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated [and, we might add, the time the decision is judicially reviewed]. . . . If upon the coming down of the order

litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." *ICC* v. *Jersey City*, 322 U. S. 503, 514 (1944).

See also *Northern Lines Merger Cases*, 396 U. S. 491, 521 (1970).

We have also made it clear that the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review.

"Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe* v. *Sierra Club*, 427 U. S., at 410 n. 21.

We think the Court of Appeals has forgotten that injunction here and accordingly its judgment in this respect must also be reversed.[22]

---

[22] The court also indicated at the end of the opinion in *Aeschliman* that since "this matter requires remand and reopening of the issues of energy conservation alternatives as well as recalculation of costs and benefits, we assume that the Commission will take into account the changed circumstances regarding Dow's [the principal customer for the plant's steam] need for process steam, and the intended continued operation of Dow's fossil-fuel generating facilities." 178 U. S. App. D. C., at 335, 547 F. 2d, at 632. As we read the Court of Appeals opinion, however, this was not an independent basis for vacating and remanding the Commission's licensing decision. It also appears from the record that the Commision has reconsidered the changed circumstances and refused to reopen the proceedings at least three times, see App. 346–347, 348–349, 350–351, and possibly a fourth, see Brief for Nonfederal Respondents in No. 76–528, pp. 19–20, n. 8. We see no error in the Commission's actions in this respect.

## B

Finally, we turn to the Court of Appeals' holding that the Licensing Board should have returned the ACRS report to ACRS for further elaboration, understandable to a layman, of the reference to other problems.

The Court of Appeals reasoned that since one function of the report was "that all concerned may be apprised of the safety or possible hazard of the facilities," the report must be in terms understandable to a layman and replete with cross-references to previous reports in which the "other problems" are detailed. Not only that, but if the report does not so elaborate, and the Licensing Board fails to *sua sponte* return the report to ACRS for further development, the entire agency action, made after exhaustive studies, reviews, and 14 days of hearings, must be nullified.

Again the Court of Appeals has unjustifiably intruded into the administrative process. It is true that Congress thought publication of the ACRS report served an important function. But the legislative history shows that the function of publication was subsidiary to its main function, that of providing technical advice from a body of experts uniquely qualified to provide assistance. See 42 U. S. C. § 2039; S. Rep. No. 296, 85th Cong., 1st Sess., 24 (1957); Joint Committee on Atomic Energy, A Study of AEC Procedures and Organization in the Licensing of Reactor Facilities, 85th Cong., 1st Sess., 32–34 (Comm. Print 1957). The basic information to be conveyed to the public is not necessarily a full technical exposition of every facet of nuclear energy, but rather the ACRS's position, and reasons therefor, with respect to the safety of a proposed nuclear reactor. Accordingly, the ACRS cannot be faulted for not dealing with every facet of nuclear energy in every report it issues.

Of equal significance is the fact that the ACRS was not obfuscating its findings. The reports to which it referred were matters of public record, on file in the Commission's

public-documents room. Indeed, all ACRS reports are on file there. Furthermore, we are informed that shortly after the Licensing Board's initial decision, ACRS prepared a list which identified its "generic safety concerns." In light of all this it is simply inconceivable that a reviewing court should find it necessary or permissible to order the Board to *sua sponte* return the report to ACRS. Our view is confirmed by the fact that the putative reason for the remand was that the public did not understand the report, and yet *not one* member of the supposedly uncomprehending public even asked that the report be remanded. This surely is, as petitioner Consumers Power claims, "judicial intervention run riot." Brief for Petitioner in No. 76–528, p. 37.

We also think it worth noting that we find absolutely nothing in the relevant statutes to justify what the court did here. The Commission very well might be able to remand a report for further clarification, but there is nothing to support a court's ordering the Commission to take that step or to support a court's requiring the ACRS to give a short explanation, understandable to a layman, of each generic safety concern.

All this leads us to make one further observation of some relevance to this case. To say that the Court of Appeals' final reason for remanding is insubstantial at best is a gross understatement. Consumers Power first applied in 1969 for a construction permit—not even an operating license, just a construction permit. The proposed plant underwent an incredibly extensive review. The reports filed and reviewed literally fill books. The proceedings took years, and the actual hearings themselves over two weeks. To then nullify that effort seven years later because one report refers to other problems, which problems admittedly have been discussed at length in other reports available to the public, borders on the Kafkaesque. Nuclear energy may some day be a cheap, safe source of power or it may not. But Congress has made a

choice to at least try nuclear energy, establishing a reasonable review process in which courts are to play only a limited role. The fundamental policy questions appropriately resolved in Congress and in the state legislatures are *not* subject to re-examination in the federal courts under the guise of judicial review of agency action. Time may prove wrong the decision to develop nuclear energy, but it is Congress or the States within their appropriate agencies which must eventually make that judgment. In the meantime courts should perform their appointed function. NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural. See 42 U. S. C. § 4332. See also *Aberdeen & Rockfish R. Co.* v. *SCRAP,* 422 U. S., at 319. It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been members of the decisionmaking unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, *Consolo* v. *FMC,* 383 U. S. 607, 620 (1966), not simply because the court is unhappy with the result reached. And a single alleged oversight on a peripheral issue, urged by parties who never fully cooperated or indeed raised the issue below, must not be made the basis for overturning a decision properly made after an otherwise exhaustive proceeding.

*Reversed and remanded.*

MR. JUSTICE BLACKMUN and MR. JUSTICE POWELL took no part in the consideration or decision of these cases.