### SAN LUIS OBISPO MOTHERS FOR PEACE

v.

### U.S. NUCLEAR REGULATORY COMM., et al.

No. 86–7297.

United States Court of Appeals, Ninth Circuit.

Sept. 30, 1986.

WIGGINS, Circuit Judge, dissenting:

Presuming it has a better grasp of nuclear engineering than the NRC, the majority, 799 F.2d 1268 (9th Cir.1986), substitutes its judgment in this narrow technical area committed by Congress to the NRC's discretion.

When reviewing the Commission's order, this court is bound by the strictures of the Administrative Procedure Act (APA) that a reviewing court shall not set aside agency actions unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). Congress has entrusted the NRC with broad authority to regulate the nuclear power industry. It is not the court's role to diminish that authority absent a clear abuse of discretion.

> Nuclear energy may some day be a cheap, safe source of power, or it may not. But Congress has made a choice to at least try nuclear energy, establishing a reasonable review process in which courts are to play only a limited role. The fundamental policy questions appropriately resolved in Congress and in the state legislatures are *not* subject to reexamination in the federal courts under the guise of judicial review of agency action.

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 557–58, 98 S.Ct. 1197, 1218, 55 L.Ed.2d 460 (1978). Our role is to balance, within the confines of the APA, the efficient implementation of the Commission's mandate with the rights of interested parties to be heard and to contribute to the decision-making process.

The narrow question in this case is *when*, not *whether*, the NRC is obligated to provide San Luis Obispo Mothers for Peace and the Sierra Club with a public hearing on PG & E's license amendments that allow reracking.[1] On the surface this looks like a simple procedural issue—traditionally an area of high judicial competence. On closer examination, however, it is clear that the outcome is controlled by substantive technical questions applied to a procedural *standard.*

The NRC was authorized to set that standard by the Sholly amendment, 42 U.S.C. § 2239(a)(2)(A) (1982), one of a series of measures Congress passed to help expedite the licensing of nuclear power

---

1. In its Memorandum and Order of July 22, 1986, the Commission, though not persuaded that its staff erred in its determination of no significant hazards for the entire reracking process, granted petitioner's request for a stay of the amendment authorizing an increase in the total spent fuel capacity of each pool. Thus, the only question before this court is the immediately effective amendment allowing installation of free-standing spent fuel racks rather than the currently authorized anchored racks. *See* NRC Memorandum and Order CLI–86–12 at 18 (July 22, 1986).

plants. It was necessitated in part by a Court of Appeals ruling that *all* licensing amendments required pre-amendment hearings on request. *See Sholly v. NRC*, 651 F.2d 780 (D.C.Cir.1980), *vacated to consider mootness*, 459 U.S. 1194, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983). The NRC requested relief from unnecessary disruptions or delays of nuclear power plant operation, and unnecessary regulatory burdens not related to significant safety benefits. *See* S.Rep. No. 113, 97th Cong., 1st Sess. 14 (1981) *reprinted in* 1982 U.S.Code Cong. & Admin.News 3592, 3598. The statute allows a licensing amendment to take immediate effect "upon a determination *by the Commission* that such amendment involves no significant hazards consideration." 42 U.S.C. § 2239(a)(2)(A) (emphasis added). Congress thus created a system that requires pre-amendment hearings on request only for those changes entailing "significant hazards." When Congress delegated to the NRC the power to make no significant hazards determinations, it did not mean that the courts rather than the NRC should determine what is a significant hazard.

Petitioners hypothesize that collisions between the racks or between the racks and walls during a seismic event could result in the release of nuclear materials and could create a criticality accident, i.e., an accident that would set in motion a nuclear chain reaction. The NRC, however, evaluated the seismic sufficiency of the racks and pools and the possibility of a criticality accident. The racks and pools were designed to seismic Category I requirements, creating "no significant change in the consequences resulting from a postulated seismic event from those previously determined." NRC, Safety Evaluation by The Office of Nuclear Reactor Regulation Re-

lating to the Reracking of the Spent Fuel Pools at the Diablo Canyon Nuclear Power Plant, 28 (May 30, 1986) [hereinafter cited as Safety Evaluation]. Moreover, the NRC had previously evaluated the potential of a criticality accident in connection with a licensing proceeding. The NRC Atomic Safety and Licensing Appeal Board affirmed the conclusion that "[a]s long as the fuel elements are in racks, no critical mass can be formed. Should the storage racks collapse or the fuel elements be dislodged and fall into precisely that geometrical arrangement necessary to criticality, the borated pool water would *preclude* its occurrence." *In re Pacific Gas & Electric Co.*, 3 NRC 809, 820 n. 26 (1976) (emphasis added).

The majority does not pretend to evaluate the technical adequacy of NRC's safety analysis, nor does it find that petitioners met their burden by showing that the NRC's determination was arbitrary and capricious. Instead, it seizes on the language "[c]reate[s] the possibility of a new or different kind of accident from any accident previously evaluated," 10 C.F.R. § 50.92(2), and applies that to the potential of rack-wall *collisions*. There its analysis stops. The potential of such an "accident" becomes a *per se* violation of the NRC's standard. The NRC evaluated the consequences of seismic rack-wall collisions, and determined that no significant hazard existed. Safety Evaluation at 11–14, 28, and App. A at 43–48.[2] The simple possibility of a rack-wall collision should *not* be sufficient to overturn an NRC order. The NRC and petitioners are concerned with the possibility of nuclear accidents and radiation leakage; it is to these consequences that the NRC directed the thrust of its technical evaluations.[3]

---

**2.** The NRC notes that free-standing spent fuel racks are not new to the nuclear industry, and increasingly replace anchored fuel racks. *See* NRC Memorandum and Order CLI–86–12 at 13 (July 22, 1986). PG & E characterizes the free-standing racks as the product of advanced technology that, by allowing sliding movement, reduces seismic stresses that can occur on racks restrained by anchor bolts.

**3.** I confess to being confused about the majority's actual rationale. It asserts that the amendment "creates the possibility that, in the event of an earthquake, the racks will collide with the walls of the pools or with each other, *enhancing the risk of a nuclear reaction occurring in the pools.*" 799 F.2d at 1270 (emphasis added). Thus it creates the possibility of a new or different kind of accident. *Id.* At the same time, the

To bolster its argument that the NRC failed to follow its own standards, the majority implies that the NRC's no significant hazards determination is inconsistent with its decision to hold later hearings. 799 F.2d at 1271. That interpretation is incorrect. Congress anticipated that requested hearings would follow a no significant hazards determination. To suggest otherwise is not only bad interpretation, it is bad public policy. It places the NRC in the position of either holding a pre-amendment hearing whenever a contention warrants a hearing, or denying the contentions that qualify a post-amendment hearing in order to justify its no significant hazards determination. Neither result is desirable. The court should recognize that the Commission acted responsibly in applying its threshold screening criteria to qualify contentions for a hearing, and that process does not cast doubt on its no significant hazards determinations.

In overturning the Commission's order, the majority dubiously applies its intuition to a complex technical matter. The practical and economic consequences of this decision are not trivial. The reconfiguration of the spent fuel pools will now be done "wet" after an initial load of spent fuel rods have been placed in the pool. Thus, PG & E workers will be required to work underwater in a radioactive environment. The current dry, unirradiated environment of Diablo Canyon's pools will be irretrievably lost.

majority concedes that the NRC analyzed the possibility of an earthquake related nuclear reaction in the pools in connection with the original license, and that the NRC is satisfied that the new racks will not increase that possibility; but this does *not* mean that no new or different kind of accident is involved. *Id.* Does the majority mean that the NRC is technically wrong on the nuclear reaction issue? If so, it has preempted the NRC's role, and accorded it no deference at all.