NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0195n.06
No. 12-5008

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

FILED
Mar 12, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KARST ENVIRONMENTAL EDUCATION AND PROTECTION, INC., | ) | |
|     *Plaintiff-Appellant*, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| FEDERAL HIGHWAY ADMINISTRATION, et al., | ) | |
|     *Defendants-Appellees*. | ) | |
| | ) | |

Before: GIBBONS and WHITE, Circuit Judges; and GREER, District Judge.[*]

**GREER, District Judge**. Karst Environmental Education and Protection, Inc. ("Karst Environmental") appeals the district court's grant of summary judgment to the Federal Highway Administration ("FHWA") in this action pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq*., against FHWA for failure to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. Karst Environmental challenged the final Environmental Impact Study ("EIS") and Record of Decision of the FHWA for the Interstate 65 ("I-65") to U.S. Highway 31-West ("U.S. 31") access improvement road project in Warren County, Kentucky. Karst Environmental raised numerous challenges to the FHWA's actions in the district court but pursues only one on appeal, i.e., that FHWA failed to comply with federal law regarding the impact of 100-year floodplains associated with sinkholes in

---

[*] The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

issuing the EIS. Because we find that Karst Environmental did not raise the issue in sufficient detail in the administrative proceedings to preserve it for appeal, we AFFIRM.

**I.**

I-65 and U.S. 31 are to the northeast of the city of Bowling Green, Kentucky. The two highways project out from Bowling Green like the spokes of a wheel. I-65 heads due East and U.S. 31 takes a Northeasterly direction, forming a corridor within their divergence (the "corridor"). Two other highways, Ky. 446 and U.S. 68/Ky. 80 are within the corridor. Industrial parks are located in the corridor, along with several public schools, commercial businesses, apartment complexes, mobile home parks and single family residences. One of the industrial parks in the corridor is the Kentucky Transpark ("Transpark"), developed by the Inter-Modal Transportation Authority ("ITA"), a non-profit agency created by the City of Bowling Green and Warren County.

In 2003, FHWA began planning for a connector road linking I-65 and U.S. 31. The FHWA published notices in the Federal Register and stated its intent to analyze the project under the NEPA. By early 2004, the FHWA had designed a number of alternative plans. After a series of public forums, the FHWA published its draft EIS in May, 2007, and identified Alternative 6-Orange as the preferred option for the road project. The publication of the draft EIS was followed by a period of public comment and, after two years, the FHWA finalized and published the final EIS, outlining the plan, scope and cost of the project. On April 15, 2010, the FHWA issued its final decision.

Bowling Green and Warren County are located atop the Pennyroyal Sinkhole Plain, one of the best examples of karst topography in the United States. The area is marked with ponds, karst valleys, caves, sinkholes and an elaborate network of underground streams and water

basins. Mammoth Cave National Park is located about ten miles from the highway project and much of the surrounding area has been designated a World Heritage Site by the United Nations Education, Scientific and Cultural Organization. A number of threatened and endangered species are found in the area.

The area is located within the Graham Springs Basin, the ("Basin"), an approximately 180 square mile ecosystem characterized by karst features such as sinkholes, caves and subterranean waters. The Basin has the largest concentration of sinkholes in the Commonwealth of Kentucky. These sinkholes are often large and deep, with an average size of 2.24 acres in the northern part of the project area and 1.63 acres in the southern part of the project area. Storm water drains into these sinkholes and into a subterranean river which flows underneath the area selected by FHWA for the highway project. Flooding related to sinkholes occurs in two ways. One is when a sinkhole's natural outlet becomes plugged by debris that is washed or dumped into the sinkhole cavity. The second occurs when the Barren River, on the western edge of the project area, floods. The EIS concluded that there are no surface streams or associated floodplains affected by the project.

## II.

The NEPA was enacted by Congress to "prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. The NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It is "designed to ensure that federal agencies consider the environmental impact of their actions." *Friends of Tims Ford v. Tennessee Valley Authority*, 585 F.3d 955, 964 (6th Cir. 2009) (quoting *Michigan v. United States*, 994 F.2d 1197, 1199 (6th Cir. 1993)).

3

The NEPA has dual objectives. "First, it 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.'" *Baltimore Gas and Electric Co. v. NRDC*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978)). "Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.*

The NEPA directs federal agencies, before engaging in action that will "significantly affect[ ] the quality of the human environment," to prepare an EIS, 42 U.S.C. § 4332, and to "consider every significant aspect of the environmental impact of a proposed action" before choosing a course of action. *Baltimore Gas and Electric*, 462 U.S. at 97. To satisfy the requirements of the NEPA, the agency need only have taken a "hard look" at the environmental impact of its decision. *Citizens Against The Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 418 (6th Cir. 2004). The role of judicial review is simply to "insure that the agency has taken a 'hard look' at environmental consequences." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).

### III.

This Court reviews the district court's grant of summary judgment *de novo*. *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013). We confine our review to the administrative record, *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997), however, and will reverse agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D). If the Court cannot "evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency

4

for additional investigation or explanation." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). We are not empowered to conduct a *de novo* inquiry into the matter. *Id.*

The standard under the APA is the "least demanding review of an administrative action," and "requires the party challenging the agency's action to 'show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations.'" *Coalition For Gov't Procurement v. Federal Prison Industries, Inc.*, 365 F.3d 435, 475 (6th Cir. 2004) (quoting *McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir. 1987)). An agency's factual findings are conclusive if supported by substantial evidence. 5 U.S.C. § 706(2)(E).

**IV.**

In short, Karst Environmental argues that the NEPA, its implementing regulations, 40 C.F.R. 1500-1508, Executive Order 11988 and various Department of Transportation and FHWA regulations required FHWA to analyze and consider alternatives to 100-year floodplain impacts in the highway project area. More specifically, Karst Environmental claims that FHWA ignored record evidence regarding sinkhole flooding, environmental impacts, and the work of other federal agencies like the Federal Emergency Management Agency ("FEMA") and failed to identify 100-year floodplains as required by the NEPA and implementing regulations.

FHWA responds that under applicable regulations the agency is not required to develop information concerning 100-year floodplains when FEMA has made flood maps available. According to FHWA, the record establishes that FEMA maps were available and no 100-year floodplains were in the project area. Therefore, FHWA's failure to conduct its own study to identify and evaluate 100-year floodplains associated with sinkholes was not arbitrary and capricious. FHWA argues, however, that Karst Environmental has forfeited the claim by not raising it in the administrative proceedings.

The district court found, without elaboration, that Karst Environmental did not raise the issue during the administrative process and its argument was untimely. *See Karst Environmental Education and Protection, Inc. v. Federal Highway Administration*, No. 1:10-cv-00154-R, 2011 WL 5301589, at *21 n..11 (W.D. Ky. Nov. 2, 2011). The district court also considered the issue on the merits, however, and sided with FHWA. Although acknowledging that applicable regulations required FHWA to perform location-hydraulic studies where federal action would be taken in floodplains, the district court found that FHWA's reliance on past floodplain analysis performed during the development of the Transpark showing that the area sits outside the 100-year floodplain was not arbitrary or capricious.

It is the latter holding of the district court which Karst Environmental asks us to reverse. We need not reach the issue, however, if the district court was correct that Karst Environmental has forfeited the issue by failing to raise it during the administrative process. And, because we agree with the district court on this issue, we will affirm on that basis.

"[W]hile it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' positions and contentions." *Vermont Yankee*, 435 U.S. at 553. Comments must meet "a threshold requirement of materiality" before an agency response is required. *Id*. "The comment cannot merely state that a particular mistake was made . . .; it must show why the mistake was of possible significance in the result . . . ." *Id*. (quoting *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (1973), *cert. denied sub nom. Portland Cement Corp. v. Administrator, EPA*, 417 U.S. 921 (1974)). A party "challenging an agency's compliance with NEPA must structure [its] participation so that it . . . alerts the agency

6

to the [party's] positions and contentions, in order to allow the agency to give the issue meaningful consideration." *Dept. of Transportation v. Public Citizen*, 541 U.S. 752, 764 (2004) (internal quotations and citation omitted).

We have previously discussed the obligations of a party challenging agency action to raise its challenge before the agency "at a time when the [agency] could have taken any necessary corrective action without undue delay . . ." *Commonwealth of Kentucky ex rel. Beshear v. Alexander*, 655 F.2d 714, 718 (6th Cir. 1981). The time to complain is at the comment stage, not after the agency has completed its decision making process. *Vermont Yankee*, 435 U.S. at 553. Not only must the claim be presented during the administrative process, it must be presented "in sufficient detail to allow the agency to rectify the alleged violation." *Forest Guardians v. U.S. Forest Service*, 495 F.3d 1162, 1170 (10th Cir. 2007); s*ee also Kleissler v. U.S. Forest Service*, 183 F.3d 196, 202 (3d Cir. 1999) ("[T]he claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same issue now raised in federal court."); *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) ("Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met . . . ."). We cannot review "issues that have not been passed on by the agency . . . whose action is being reviewed." *New Jersey v. Hufstedler*, 724 F.2d 34, 36 n.1 (3d Cir. 1983) *rev'd on other grounds*, 470 U.S. 632 (1985).

FHWA argues that Karst Environmental has forfeited its claim because it did not, in its extensive comments before the agency, comment on the need for FHWA to identify 100-year floodplains associated with the sinkholes in the project area nor that the previously done study

related to the Transpark development was inadequate. In its initial brief, Karst Environmental identifies comments made by Roger Brucker, co-founder of Karst Environmental, in response to the draft EIS. Those comments, consisting of two paragraphs,[1] appear at page 15 of Brucker's comments:

**Defect # 7 Flood Response**

> The DEIS points out that the entire project is above the 100-year floodplain. It also claims that there are no jurisdictional wetlands within the project APE. However, the original Transpark Environmental Assessment by Wilbur Smith and Associates identified several jurisdictional wetlands, as characterized by dye traced waters, hydric soils, and wetland plans. I believe that U. S. Corps of Engineers should investigate this site to resolve the issue of whether the dismissive language of the DEIS is correct.

> Sinkholes in this karst region *do* flood, as attested to by frequent karst flood events in Bowling Green. Several roads in the vicinity of Oakland, KY have High Water Warnings signs. Detention ponds, lined or not, are unlikely to be sized to hold 100-year deluges, yet several such rains have occurred within the past ten years. Parts of Bowling Green routinely flood during heavy rains because the cave drainage capacity is restricted.

Karst Environmental also points to several other portions of the administrative record that it argues put FHWA on notice of its argument that FHWA was obligated to conduct an independent evaluation of 100-year floodplains related to sinkholes in the karst topography of the project area. Karst Environmental first points to a statement appearing in an appendix submitted by Brucker with his comments to FHWA. The statement, offered with respect to "Defect # 2 Mischaracterization of Groundwater Divides" in Brucker's comments, reads:

> The ITA states that flooding at the proposed Transpark would not be a problem as the site is above the Barren River flood plain. This assessment ignores the fact that severe sinkhole flooding is common in the Bowling Green area, and on the proposed Transpark site. A discussion of this problem, with associated

---

[1] A total of over 450 pages of comments were submitted on the draft EIS.

8

expensive losses due to flooding and retention pond collapse, is presented in Crawford and Haufman 1989 pg. 41-49. This document calls for a comprehensive study to establish the 100-year flood level around sinkholes.

Karst Environmental also relies on statements made by individuals and organizations about sinkhole flooding during the environmental assessment process for the Transpark in 2001, which were made part of the administrative record for the highway project.[2] First, Karst Environmental points to a comment made by Dr. Michael May, a registered professional geologist and professor of geology at Western Kentucky University:

> Geologically, we cannot deny that we live on a karst plain and that many areas in sinkhole depressions are basically circular floodplains (erroneously pointed out in the EA that there is no flood plain consideration for the Yellow Site). How can the ITA say that there are no floodplain considerations in depression riddled areas of the transpark site when there have been houses razed in Bowling Green by [FEMA] due to multiple flooding events? As any geologist or farmer knows, sinkholes become wetlands and flood plains when flooded.

Second, Karst Environmental relies on a comment made by the Kentucky Waterways Alliance about the Transpark:

> The Graham Springs basin is located in a karst region . . . . If the area is paved and developed, the sheer magnitude of additional water runoff during seasonal rain events will inundate the natural drainage of the area likely increasing local flooding.
> . . . .
> The following are issues KWA believes need to be addressed in regard to this project:
> . . . .
> 12. Increased flooding due to the alteration of the natural drainage mechanism for the region.

Finally, Karst Environmental points to a comment made by the Cave Research Foundation:

---

[2] It is not clear whether the Transpark environmental assessment was made part of the administrative record by FHWA or submitted by Karst Environmental.

9

The karst landscape and associated drainage systems are extremely sensitive and venerable to urban and industrial development and related land uses. The impact of such development manifests itself not only by increasing the potential of sinkhole flooding and collapse (which pose serious safety hazards), but also by degrading water quality and ultimately affecting the existing eco systems and the humans who coexist with them. The environmental experiences at Bowling Green, Kentucky, and within other cities in towns built on karst, can certainly support the existence of these potential problems.

From these parts of the administrative record, Karst Environmental claims that "FHWA had abundant notice from [Karst Environmental] and others that sinkholes in the project area flood during the 100-year storm event." Significantly, Karst Environmental does not, however, claim that it or anyone else ever, at any point during the administrative process, made the argument that FHWA had a legal obligation to determine whether the project area includes 100-year floodplains and, if so, perform follow-up analysis. The question then is whether the claim raised in the administrative process was similar enough to that raised in the federal complaint that the agency was on notice that it must consider and decide the same claim now raised. Our review of the administrative record convinces us that it was not.

Brucker's comments are vague and fairly subject to the interpretation urged by FHWA, i.e., that the comment raised concerns about sinkhole flooding associated with storm-water run-off but not that FHWA was required to conduct a study and evaluate 100-year sinkhole floodplains. In fact, Brucker's comments do not clearly take issue with the conclusion of the draft EIS that the entire project is above the 100-year floodplain. On the contrary, the comment focuses on the argument that the "original Transpark Environmental Assessment" identified "several jurisdictional wetlands," in contrast to the claim of the draft EIS that there are no jurisdictional wetlands in the project area and Brucker's "belie[f]" that the U.S. Corps of Engineers, not FHWA, should investigate to resolve that issue. The FHWA's response indicates

that it understood the comment in the same way and notes the need for further study of detention pond sizing in response to Brucker's comments regarding whether detention ponds were likely sized to hold the run-off. A suggestion that sinkholes flood is not so similar to the claim now raised by Karst Environmental to allow us to conclude that FHWA was placed on notice of, and given an opportunity to decide, the same claim now raised.

Likewise, the statement in Brucker's appendix refers to a statement by the ITA during the environmental assessment for the Transpark which states that the site is above the Barren River floodplain and calls for further study of flooding related to that environmental assessment based on a 1989 study which was apparently not submitted to FHWA. Furthermore, the comment relates to a separate section of Brucker's comments, not those regarding his "flood response."

The other statements relied upon by Karst Environmental were all made (and presumably considered) during the Transpark environmental assessment. Karst Environmental's comments are not of sufficient clarity to alert FHWA that these concerns still needed to be assessed through a separate 100-year floodplains study by FHWA or that the law required FHWA to do so. We conclude, therefore, that Karst Environmental did not raise the issue in the present litigation with "sufficient clarity" to allow FHWA to understand and address the specific issue raised. *See Idaho Sporting Congress*, 305 F.3d at 965; *Vermont Yankee*, 435 U.S. at 553-54 ("[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstruction by making cryptic and obscure references to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'").

11

## V.

Because we conclude, for the reasons set forth above, that Karst Environmental did not meet its "obligation of meaningful participation" in the administrative process by stating its position with clarity at a time when FHWA could have taken necessary corrective actions without undue delay, we AFFIRM.