RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LITTLE TRAVERSE LAKE PROPERTY OWNERS
ASSOCIATION; DOUGLAS JONES; L. GENE MORSE;
LINDA MORSE; MARY ANN SHUTZ; MARCIA
SKJAERLUND,

　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

NATIONAL PARK SERVICE,

　　　　　　*Defendant-Appellee*.

No. 17-1064

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:15-cv-00789—Gordon J. Quist, District Judge.

Argued: October 13, 2017

Decided and Filed: February 23, 2018

Before: KEITH, ROGERS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Graham K. Crabtree, FRASER TREBILCOCK DAVIS & DUNLAP, P.C., Lansing, Michigan, for Appellants. Kevin W. McArdle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Graham K. Crabtree, Thaddeus E. Morgan, FRASER TREBILCOCK DAVIS & DUNLAP, P.C., Lansing, Michigan, for Appellants. Kevin W. McArdle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  This case presents the question of what citizens must do during the administrative planning stage of a federal agency action in order to preserve a later challenge to the agency's final decision under the National Environmental Policy Act ("NEPA").  In 2008, the National Park Service proposed a plan to build a scenic trailway through the Sleeping Bear Dunes National Lakeshore in Leelanau County, Michigan.  One of the alternative routes for the trailway ran along Traverse Lake Road, but residents along that road opposed sending Lakeshore visitors down their residential street, so they submitted objections to the proposed plan during the public comment period.  The Park Service attempted to address the objections to the 2008 proposal, and in 2009, the Park Service issued a revised proposal that made significant changes to the portion of the trail along Traverse Lake Road.  No one submitted objections to the revised plan, and the Park Service approved the route along Traverse Lake Road after it made a finding of no significant impact.

Almost six years later, the Little Traverse Lake Property Owners Association, along with individual residents on Traverse Lake Road (collectively "Plaintiffs") filed the current action, contending that the 2009 plan violates NEPA and its implementing regulations.  In support of their claims, Plaintiffs sought to supplement the administrative record with additional pictures, maps, and other documents.  However, the district court correctly dismissed most of Plaintiffs' claims as forfeited because Plaintiffs failed to participate in the Park Service's planning process in a manner that would alert the Park Service to their objections to the 2009 plan, and therefore, Plaintiffs did not allow the Park Service the opportunity to give the issues meaningful consideration before issuing its final decision.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004).  The district court also correctly held that Plaintiffs' lone preserved claim is without merit, and that Plaintiffs have failed to show that there are exceptional circumstances requiring supplementation of the administrative record.

**I.**

The Sleeping Bear Heritage Trail is a hard-surfaced, non-motorized, multi-use trail that will span twenty-seven miles from the northern end of the National Lakeshore at County Road 651 to the Leelanau-Benzie county line south of Empire, Michigan.  The Trail currently runs almost twenty-two miles from Empire north to Bohemian Road (County Road 669), just west of Traverse Lake Road.  The Trail is part of the Lakeshore General Management Plan, and was developed by the Leelanau Scenic Heritage Route Committee (the "Committee"), which was comprised of representatives from the Park Service, local municipalities, the Michigan Department of Transportation, the Leelanau Conservancy, the Leelanau County Road Commission, and other interested organizations and citizens.

In January 2007, because the Trail project's development must comply with NEPA, 42 U.S.C. §§ 4321 *et seq.*, the Committee solicited proposals for a pre-engineering study and draft environmental assessment.  NEPA "sets forth essentially procedural requirements to assess environmental impacts of major federal actions."  *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 414 (6th Cir. 2004) (*Pellissippi Parkway*).  In general, NEPA requires agencies to prepare an environmental impact statement, which provides an explanation of the environmental impacts of, and possible alternatives for, major federal actions that significantly affect the quality of the human environment.  *See* 42 U.S.C. § 4332(C).  However, if an agency is uncertain whether a project will significantly affect the quality of the human environment, it may first prepare an environmental assessment, which is a "concise public document" that briefly discusses the environmental impacts of, and alternatives to, a proposed action.  40 C.F.R. § 1508.9.  "[T]he environmental assessment functions as a screening device . . . [that] allows agencies with limited resources to focus on truly important federal actions," and it "has been described as a rough-cut, low-budget environmental impact statment." *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 504 (6th Cir. 1995) (citations and internal quotation marks omitted).

On October 1, 2008, the Park Service released a proposed plan and environmental assessment (the "2008 Trail Plan"), which stated that the plan's "purpose and need" was to

"assist in the creation of a non-motorized trailway that will provide a continuous scenic pathway" within Leelanau County, beginning at the intersection of M-22 and Manning Road and ending at Good Harbor Bay, County Road 651. The 2008 Trail Plan divided the twenty-seven mile path into nine distinct segments in order to analyze alternatives and environmental impacts with more specificity, and in each segment the plan considered three alternatives—Alternative A, Alternative B, and No Action.

The easternmost segment, Segment 9, encompasses the Little Traverse Lake area at issue in this suit. Segment 9 runs from the intersection of Bohemian Road and Traverse Lake Road, east to the swimming beach and facilities located at the northern end of County Road 651, near the northern boundary of the Lakeshore, and provides access to historic Bufka Farm. The 2008 Trail Plan routed Alternative A for Segment 9 south of Little Traverse Lake along Highway M-22, but for Alternative B, the "preferred alternative," the 2008 Trail Plan proposed a ten-foot off-road asphalt section on the north side of M-22 up to Traverse Lake Road that would then turn north, using Traverse Lake Road for approximately three miles before emerging back on the M-22 right-of-way.

Both the east and west ends of Traverse Lake Road intersect with M-22, and the road extends approximately 2.7 miles between those intersections. Traverse Lake Road is approximately twenty-two feet wide, with unpaved shoulders, and mature trees are present on both sides of the road. The south side of Traverse Lake Road is bounded by more than seventy private parcels. Wetland areas are located near the east and west ends of Little Traverse Lake, and sand dunes, some steep and more than fifty feet in height, are present along the eastern end of the road.

The 2008 Trail Plan was made available for public review and comment for thirty days, and the Park Service held an open house meeting on October 16, 2008. The Park Service received approximately fifty comments during the comment period. Among the comments, residents living along Traverse Lake Road objected to the expansion of the roadway to accommodate the Trail, asserting that it would "turn a quiet residential street into a highway with paved shoulders." Opponents of Alternative B also expressed concerns that the Alternative

would present hazards for walkers, joggers, and bikers due to increased traffic.  Opponents also voiced concerns about Alternative B's potential impact on wetlands located near both ends of Little Traverse Lake and dunes at the east end of Traverse Lake Road.

The president of the Little Traverse Lake Property Owners Association "strongly oppose[d] any modification of Traverse Lake Road to provide for bicycle lanes," asserting that "[c]onstruction of a bicycle lane on the north side of Traverse Lake Road" would interfere with "critical dunes and require the removal of many, many mature trees" and it would be "both costly and environmentally dreadful!"  The Property Owners Association also stated that a trail on the south side of the road would cross more than seventy driveways and interfere with utilities, mailboxes, and landscaping, contrary to the Park Service's assessment that the Trail would minimally impact adjacent landowners.  Finally, the Property Owners Association suggested that the Trail be rerouted to terminate at the north end of Bohemian Road at Lake Michigan.

After considering the public comments to the 2008 Trail Plan, the Park Service issued a revised plan and environmental assessment in March 2009 (the "2009 Trail Plan").  The revised plan maintained the initial proposal for Alternative A, but modified Alternative B for segments 1, 2, and 9.  The revised Alternative B for Segment 9 is approximately 4.8 miles long, 2.3 miles of which runs along Traverse Lake Road.  It is described as:

> [A] 10′ off-road asphalt section on the north side of M-22 up to Traverse Lake Road.  The Trailway turns north on the west side of Traverse Lake Road *onto an off-road boardwalk* within the county road right of way.  It continues as a *separate 10′ off road asphalt path on the north side* of Traverse Lake Road either within the county road right-of-way or on Lakeshore property south of proposed wilderness.  The Trailway would *then follow an old two track road that runs from the northeast end* of Little Traverse Lake becoming a crushed limestone path *behind the Bufka Farmstead*. [Emphasis added.]

Thus, while the 2009 Trail Plan retained a route along Traverse Lake Road, it proposed three significant changes to address the concerns identified in the earlier comments.  First, the Park Service sought to minimize the impacts to wetlands by using an off-road boardwalk to cross the wetlands and Shalda Creek at the west end of Little Traverse Lake, rather than widening Traverse Lake Road to accommodate the Trail.  Second, after crossing the wetlands, the 2009

Trail Plan proposed a separate asphalt path on the north side of Traverse Lake Road, either within the county road right-of-way or on Lakeshore property rather than using the roadway surface.  This separate path was suggested to address safety concerns about bike and pedestrian traffic, and to minimize the impact on Traverse Lake Road residents, almost all of whom live on the south side of the road.  The separate path also allowed for greater flexibility in the Trail's path, so that the Trail can avoid mature trees.  Finally, rather than crossing most of the wetlands at the east end of the lake, the Park Service proposed that the Trail follow "an old two track road that runs from the northeast end of Little Traverse Lake becoming a crushed limestone path behind the Bufka Farmstead."

The 2009 Trail Plan analyzed the impact of the trailway alternatives on topography, wetlands and water quality, vegetation and wildlife, Michigan state-listed species, soils, socioeconomics, cultural resources, visitor opportunities and use, and operations and maintenance.  The 2009 Trail Plan determined that "four wetland areas . . . could be impacted," and that "[t]hree surface waters could be affected," including "Shalda Creek on Traverse Lake Road."  However, the environmental assessment explained that "boardwalks or hardened trail surfaces[] would be located to the extent feasible to avoid directly dredging or filling wetlands," and the 2009 Trail Plan described best management and monitoring practices for reducing construction impacts.  Based on its analysis, the Park Service concluded that Alternative B "would likely have short-term and long-term minor adverse impacts on the wetlands and water quality of the Lakeshore."

The 2009 Trail Plan also determined that Alternative B for Segment 9 could impact vegetation and forest resources, including "direct removal or loss of vegetation that serves as wildlife habitat."  Indeed, the Trail Plan explained that because Segment 9 would be constructed in forested areas, "[trail] [p]lacement outside rights-of-way would be required in Segment[] . . . 9," and that "development of a new trail through an area of relatively native forest where a swath of vegetation is removed to construct the trail would represent habitat loss."  However, the Trail Plan concluded that "[m]inimal tree removal is expected due to the wide spacing of existing mature trees in this area," and that "virtually all trail locations out of the highway rights-of-way are on previously disturbed areas, or areas with widely spaced trees."  Thus, the Park Service

concluded that Alternative B's "impacts to vegetation are likely, in the short-term to be moderate adverse and in the long-term, to be minor and adverse."

The 2009 Trail Plan addressed dune ecosystems in its assessment of impacts on topography and soils.  The environmental assessment acknowledged that slopes in portions of Segment 9 range from 18% to 45%, and that "retaining walls may have to be used when the slopeside exceeds 25%."  The Trail Plan also considered the physical characteristics of the dunes, discussing the erodibility of the soil type in relation to Trailway development.  While the environmental assessment recognized that some adverse impacts to topography might occur in several segments, it explained that "[d]isturbance of areas with steep side slopes and gradients would be avoided where possible."  The environmental assessment described best management practices that would be employed to reduce impacts, including "silt fencing . . . in areas of steep topography" and "restoration to disturbed areas in order to reduce destructive erosion."  The Park Service concluded that revised Alternative B "would have short- and long-term minor adverse impacts on topography," and short-term "moderate" and long-term "minor" adverse impacts on soils.

The Park Service made the 2009 Trail Plan available for public review and comment from March 5 to April 4, 2009, publicizing the revised Trail Plan in the same manner as the 2008 Trail Plan.  This time, the Park Service received only five comments on the revised Trail Plan, none of which objected to the revised Segment 9 or raised concerns regarding Traverse Lake Road.  None of the comments submitted during the 2009 comment period were submitted by Traverse Lake Road residents.

In August 2009, the Park Service issued a finding of no significant impact ("FONSI") and selected preferred Alternative B for Segment 9, concluding that an environmental impact statement was not required.  "After analyzing the [environmental assessment], the agency decides whether to prepare an [environmental impact statement] or issue a [FONSI]," which "briefly presents the reasons why an agency action will not create a significant environmental impact and why an [environmental impact statement] will not be issued."  *Pellissippi Parkway*, 375 F.3d at 414 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).  The FONSI here stated that the

"[d]isturbance of interior vegetated areas, steep slopes, and difficult soils would be minimized and sensitively planned," and therefore, there were no major adverse or beneficial impacts that would require an environmental impact statement analysis.  The Park Service also adopted the mitigation and best management analysis in the revised Trail Plan.  Moreover, the Park Service found that "[t]here were no highly uncertain, unique, or unknown risks identified during either the preparation of the environmental assessment or during the two public review periods."  Based on the analysis in the 2009 Trail Plan, the Park Service concluded that "[t]he selected alternative will not have a significant effect on the human environment."

Nearly six years later, on July 31, 2015, Plaintiffs filed a Complaint for Declaratory Relief, asserting that the Park Serivce had violated NEPA and its implementing regulations, 40 C.F.R. §§ 1500 *et seq.*, by: (1) issuing its FONSI based upon an inadequate and faulty environmental assessment; (2) failing to prepare a full Environmental Impact Statement; (3) failing to analyze available alternatives;[1] and (4) relying upon incomplete, misleading, and inaccurate data in formulating its environmental assessement and FONSI.  On January 15, 2016, the Park Service filed the 3,005-page administrative record in accordance with the district court's order, and on February 15, Plaintiffs objected and moved for leave to supplement the record.  Plaintiffs sought to include photographs, maps, lay testimony, and other evidence.

On April 4, the district court mostly denied Plaintiffs' request to supplement the record, although the Park Service agreed to supplement the record with "Director's Order No. 12" ("DO-12 Handbook"), which provides guidance to Park Service employees for complying with NEPA.  The court held that the Park Service had neither negligently nor deliberately excluded any materials from the record.  The court indicated that the record appeared to provide an adequate basis for it to determine whether the Park Service considered all relevant factors, because the record contained materials addressing the issues that Plaintiffs claimed the additional evidence addressed.  Thus, according to the court, Plaintiffs failed to meet their burden of showing "exceptional circumstances" requiring supplementation of the record.

---

[1]In particular, Plaintiffs claimed that the Park Service failed to evaluate their suggestion during the 2008 comment period to terminate the Trail at the north end of Bohemian Road.

The parties subsequently filed cross-motions for summary judgment.  On December 21, 2016, the district court issued an opinion granting the Park Service's motion for summary judgment. *Little Traverse Lake Prop. Owners Assoc. v. Nat'l Park Serv.*, 223 F. Supp. 3d 691 (W.D. Mich. 2016).  The district court held that Plaintiffs had forfeited all of their claims, except for their claim that the Park Service had failed to consider reasonable alternatives, because Plaintiffs did not adequately raise their objections during the administrative process.  *Id.* at 694–96.  Moreover, the court held that, while Plaintiffs had preserved their claim that the Park Service failed to consider reasonable alternatives, the Park Service was not required to consider the alternative route Plaintiffs proposed during the 2008 public comment period because it did not fulfill the Trail Plan's reasonable statement of purpose and need.  *Id.* at 696–97. Accordingly, the court granted the Park Service's motion for summary judgment as to all four claims.  *Id.* at 697.

## II.

On appeal, Plaintiffs challenge the district court's conclusion that they failed to preserve most of their challenges to the 2009 Trail Plan.  Plaintiffs also argue that the Park Service violated NEPA when it failed to consider an alternative route proposed by Plaintiffs during the 2008 public comment period.  Finally, Plaintiffs contend that the district court abused its discretion when it denied their motion to supplement the administrative record with additional photos, maps, and lay testimony.  However, none of Plaintiffs' arguments is persuasive.

Plaintiffs' challenges to the adequacy and accuracy of the 2009 Trail Plan's environmental analysis as well as their challenge to the Park Service's decision not to issue an environmental impact statement were forfeited.  To preserve a challenge to an agency action under NEPA, parties must timely speak up during the administrative planning process so as to "alert[] the agency to the [parties'] position and contentions, in order to allow the agency to give the issue meaningful consideration." *Pub. Citizen*, 541 U.S. at 764 (citation and internal quotation marks omitted, second alteration in original).  Plaintiffs did not preserve their challenges for two related reasons.  First, Plaintiffs failed to raise any objections to the 2009 Trail Plan during the 2009 public comment period, even though they were required to make sure

that the Park Service was aware of their continued objections and concerns, so that the agency could give the issues meaningful consideration before issuing its final decision. *See id.* Second, while Plaintiffs articulated objections and concerns regarding the 2008 Trail Plan, the Park Service meaningfully addressed Plaintiffs' specific complaints with significant changes in the revised 2009 Trail Plan, requiring Plaintiffs either to renew their objections or otherwise to make clear to the Park Service that the revised proposal did not sufficiently resolve their objections to the 2008 Trail Plan.

It is true that many of Plaintiffs' comments during the 2008 public comment period were sufficient to alert the Park Service to deficiencies in the 2008 Trail Plan,[2] but those comments did not preserve Plantiffs' ability to challenge the later 2009 Trail Plan. The Park Service specifically addressed Plaintiffs' material objections to the 2008 Trail Plan with significant changes in the revised proposal, such that it was reasonable for the Park Service to believe that it had sufficiently addressed Plaintiffs' concerns when they did not renew their objections in 2009. When an agency significantly responds to comments and objections to an environmental assessment, parties must renew their objections if they believe the agency failed to sufficiently address their concerns, so that the agency is put on notice of the parties' position and contentions with regard to the new proposal, in order to allow the agency to give the issues further

---

[2]Some of the comments to the 2008 Trail Plan that Plaintiffs submitted were not sufficient to alert the Park Service to potential NEPA violations because they either were merely generalized objections to the trailway or addressed the substance of the trailway proposal. For example, several Traverse Lake Road residents were "opposed to the proposed trail being routed onto E/W Traverse Lake Road" because it would "turn a quiet residential street into a highway with paved shoulders," and others complained that the trailway might interfere with area dunes or require the removal of "many, many trees." Still others raised speculative economic objections, claiming that routing the trail along Traverse Lake Road would increase the local tax burden by requiring additional upkeep of a park and outhouse, while also depriving a few businesses along M-22 of increased foot traffic. But such comments could not have alerted the Park Service to any inaccuracies or inadequacies in the proposal, and in order to preserve the ability to challenge an agency action, parties must present their claims during the administrative process with sufficient detail to allow the agency to rectify the alleged violation. *See Karst Envtl. Educ. & Prot., Inc. v. Fed. Highway Admin.*, 559 F. App'x 421, 424–27 (6th Cir. 2014). Moreover, objections to the Trail Plan's substance, such as Plaintiffs' complaints about removing trees, are generally insufficient to preserve a challenge to an agency action under NEPA, because NEPA does not dictate which substantive choice an agency will make; it simply prescribes the necessary process. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Friends of the Norbeck v. U.S. Forest Serv.*, 661 F.3d 969, 974 (8th Cir. 2011). Thus, NEPA does not necessarily preclude agencies from taking actions that would affect area dunes and trees, because "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350–51.

meaningful consideration; otherwise the parties' claims under NEPA are forfeited. *See Pub. Citizen*, 541 U.S. at 764.

In response to the 2008 Trail Plan proposal, Plaintiffs raised specific concerns that the Plan did not sufficiently consider safety problems created by the proposed expansion of Traverse Lake Road's shoulders to accommodate the trailway, and there were objections that the 2008 Trail Plan inaccurately concluded that expanding the road shoulder would have a "minimal" impact on Traverse Lake Road residents.  Plaintiffs also raised concerns that the 2008 Trail Plan did not sufficiently consider the impact the trailway would have on wetlands at the east and west ends of Little Traverse Lake or on the Lakeshore wilderness area that abuts Little Traverse Lake. While these comments sufficiently alerted the Park Service to deficiencies in the 2008 Trail Plan, the Park Service made meaningful substantive revisions to its proposal that were specifically aimed at addressing these concerns, so that the 2009 Trail Plan would not be similarly deficient. Had the Park Service ignored Plaintiffs' objections when it issued the revised 2009 Trail Plan, Plaintiffs claims likely would have been preserved because they would have timely "alert[ed] the agency to [their] position and contentions," and the Park Service would have failed to "give the issue meaningful consideration." *Id.* at 764.

But the Park Service took Plaintiffs' objections into consideration and attempted to modify the Trail Plan accordingly.  For example, the Park Service addressed safety concerns by moving the trail onto "a separate 10′ off-road asphalt path" rather than expanding the shoulders of Traverse Lake Road, and this modification had the added benefit of allowing the Trail's path to avoid trees "due to the wide spacing of the existing mature trees in this area."  Also, the 2009 Trail Plan sought to minimize impacts on surrounding residential property by moving the trailway onto the north side of Traverse Lake Road, avoiding the more than seventy driveways along the the road's south side.  The Park Service also made significant changes to address concerns about area wetlands, including off-road boardwalks to avoid wetlands on the west end of Little Traverse Lake, and rerouting the Trail along "an old two track road that runs from the northeast end of Little Traverse Lake becoming a crushed limestone path behind the Bufka Farmstead" to avoid wetlands on the eastern portion of Little Traverse Lake.  Finally, the Park

Service directly explained in the revised 2009 Trail Plan why it had chosen not to analyze impacts on the proposed Lakeshore wilderness area that abuts Traverse Lake Road.

After the Park Service made these significant changes to address the objections raised to the 2008 Trail Plan by Plaintiffs' comments, it was reasonable for the Park Service to believe that its modifications sufficiently addressed Plaintiffs' concerns and that the 2009 Trail Plan was not similarly inadequate.  Plaintiffs now claim that the revised 2009 Trail Plan did not sufficiently address their objections or that the revised plan is worse than the original 2008 Trail Plan, but "[t]he time to complain is at the comment stage, not after the agency has completed its decision making process." *Karst*, 559 F. App'x. at 424 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)).  Again, the burden is on parties challenging an agency action under NEPA to alert the agency to potential violations during the administrative planning stage, so that the agency can give the issue meaningful consideration. *Pub. Citizen*, 541 U.S. at 764.  Therefore, Plaintiffs' claims that the 2009 Trail Plan inadequately assessed environmental impacts, relied on inaccurate data, and that the Park Service should have issued an environmental impact statement are forfeited, because Plaintiffs' silence during the 2009 comment period did nothing to alert the Park Service to these concerns with respect to the 2009 Trail Plan.

Plaintiffs' claim that the 2009 Trail Plan failed to consider reasonable alternatives was not forfeited, because the 2009 Trail Plan failed to consider or respond to an alternative route Plaintiffs proposed during the 2008 comment period.  Plaintiffs' claim is without merit, however, because the alternative route they proposed did not accomplish the stated purpose and need of the proposed action, and therefore Plaintiffs' proposal was not a reasonable alternative that would require a detailed study and response by the Park Service. *See Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012).

During the 2008 comment period, Plaintiffs urged the Park Service to consider stopping the Trail at the end of Bohemian Road.  But "[a]lternative actions . . . are measured against the Purpose and Need Statement, which explains why the agency is proposing to spend federal money on an action that potentially results in significant environmental impact," *Coal. for the*

*Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 481 (6th Cir. 2014), and Plaintiffs' proposed alternative route does not fulfill the Trail Plan's purpose to create "a continuous scenic pathway from . . . the south boundary of Leelanau County to the north boundary of the Lakeshore at Good Harbor Bay, County Road 651, all within Leelanau County."[3] Indeed, Plaintiffs' proposal would shorten the Trail by nearly ten percent, and would frustrate the Trail's purpose of reaching the northeastern-most portions of the Lakeshore. Thus, while NEPA requires agencies to evaluate reasonable alternatives to the proposed action, *see* 42 U.S.C. § 4332(2)(C)(iii) and 40 C.F.R. § 1502.14(a), the Park Service was not required to assess Plaintiffs' proposal because it would not have achieved the Trail's stated purpose and need, and "[o]nly alternatives that accomplish the purposes of the proposed action are considered reasonable." *Webster*, 685 F.3d at 422; *see also Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011); *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1148 (9th Cir. 2000).

Plaintiffs argue that, while an agency is not required to consider and eliminate every conceivable alternative, the Trail Plan's stated purpose and need was unreasonably narrow. In particular, Plaintiffs contend that the Park Service imposed a rigid and inflexible condition on the Trail Plan by requiring that it reach the northern boundary of the Lakeshore at Good Harbor Bay, County Road 651. But while agencies may not "define [a] project so narrowly that it foreclose[s] reasonable consideration of alternatives," *Utah Envtl. Cong. v. Bosworth,* 439 F.3d 1184, 1195 (10th Cir. 2006), "[a]gencies enjoy considerable discretion in defining the purposes and needs for their proposed actions, provided that they are reasonable," *Webster*, 685 F.3d at 422. While courts may reject an agency's statement of purpose and need as "unreasonably narrow" if the statement "compels the selection of a particular alternative," *Theodore Roosevelt*

---

[3]On appeal, Plaintiffs point to two other alternative routes proposed during the 2008 comment period, but Plaintiffs failed to raise these comments before the district court, and "[o]ur function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2008). Moreover, these additional alternatives were reasonably rejected by the Park Service because they would have required the Trail to go through the proposed wilderness, and the Park Service explained in the 2009 Trail Plan that such alternatives were impractical because "[n]o trailway developments could occur on lands proposed for wilderness . . . unless and until Congress acts upon a recommendation." NEPA does not require an agency to "analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, . . . impractical or ineffective." *Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999); *see also Webster*, 685 F.3d at 427.

*Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011), the Trail Plan's stated purpose of reaching the northeastern-most portion of the Lakeshore did not compel the selection of a particular alternative, and it was reasonably calculated to achieve the Committee's stated goal of reaching the entire Lakeshore within Leelanau County.

While the Trail Plan does prescribe a definite terminus, that requirement was not unreasonably narrow because it allowed for sufficient flexibility in planning the trailway's path. In fact, the Trail Plan demonstrates considerable flexibility in achieving its purpose. In contested Segment 9 alone there were two options, Alternative A and Alternative B, that would have reached the Committee's desired terminus. Each of the other eight segments of the Trail Plan also had two action alternatives, which were planned to begin and end at the same points in each segment. That means, for example, that selecting preferred Alternative B in Segment 1 did not necessarily preclude the agency from selecting Alternative A in Segment 2. Thus, from the trailway's starting point at the Leelanau–Benzie County line to its desired terminus at County Road 651, there were more than 500 possible combinations of routes that the Trail could have taken to achieve the Park Service's goal of reaching the northeastern-most portion of the Lakeshore.

Moreover, the Park Service's desire to reach County Road 651 was calculated to ensure that the trailway achieved the Committee's stated goals to reach the entire Lakeshore within Leelanau County, and to provide non-motorized access to "the beaches, trailheads, and other points of interest" in the northeastern-most portion of the Lakeshore, including the popular swimming beach at Good Harbor Bay and historic Bufka Farm. Thus, the Trail Plan's purpose and need were reasonable and well-considered. Because Plaintiffs' proposed alternative would not have achieved the Trail Plan's reasonable purpose, Plaintiffs' claim that the Park Service failed to consider reasonable alternatives because it ignored their proposal for a truncated Trail is without merit.

Plaintiffs also contend that the Park Service's failure to include an environmental screening form in the 2009 Trail Plan was a per se violation of NEPA because the agency's DO-12 Handbook requires a screening form for any project that may have an impact on the human

environment.   The DO-12 Handbook includes an "Environmental Screening Form," which contains a checklist for determining whether a project may impact physical, natural, or cultural resources or have other effects that could require an environmental impact statement.  According to the DO-12 Handbook, the Park Service must complete a screening form for "any project that may have an impact on the human environment," and the Park Service concedes that it did not include a screening form in the 2009 Trail Plan.  But "[i]nternal operating manuals . . . do not carry the force of law, bind the agency, or confer rights upon the regulated entity[,]" *Reich v. Manganas*, 70 F.3d 434, 437 (6th Cir. 1995), and the DO-12 Handbook was intended as a guide to assist Park Service employees, not as a binding legal mandate.

The DO-12 Handbook was never published in the Federal Register, and "[f]ailure to publish in the Federal Register is an indication that the statement in question was not meant to be a regulation." *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595–96 (D.C. Cir. 2006) (emphasis removed).  Instead, the Department of the Interior has promulgated separate rules that "codify its procedures for implementing [NEPA]," 73 Fed. Reg. 61292 (Oct. 15, 2008), which do not require preparation of the screening form described in the DO-12 Handbook, *see* 43 C.F.R. pt. 46.  Moreover, Plaintiffs' assertion that the DO-12 Handbook, "according to its own terms, has 'the force of law'" is misleading, because the Handbook actually states that "*most* of its sections derive in whole or part from the CEQ regulation[s] or Interior NEPA guidelines, giving *them* the force of law."  [Emphasis added.]   However, no NEPA provision, *see* 42 U.S.C. §§ 4331–70, CEQ regulation, *see* 40 C.F.R. §§ 1500–08, or Department of the Interior supplemental NEPA regulation, *see* 43 C.F.R. pt. 46, mandates the completion of the screening form, and the Handbook does not independently create legally enforceable obligations. Therefore, the screening form described in the DO-12 Handbook represents a non-binding internal procedural requirement that does not carry the force of law, bind the agency, or confer rights, and the Park Service's failure to include an environmental screening form in the 2009 Trail Plan was not a per se violation of NEPA.

Finally, the district court's order denying Plaintiffs' request to supplement the administrative record was not an abuse of discretion because Plaintiffs failed to show "exceptional circumstances" requiring supplementation.  *See Charter Twp. of Van Buren*, 1999 WL 701924,

at *4 (6th Cir., Aug. 30, 1999).  When courts review an agency decision, "[t]he APA requires courts to review the whole record or those parts of it cited by the party." *Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) (internal quotation marks omitted).  "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision *based on the record the agency presents to the reviewing court.*"  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (citation omitted) (emphasis added).  "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cty.*, 286 F.3d 382, 387 (6th Cir. 2002) (citation and internal quotation marks omitted, alteration in original).  Indeed, supplementation of the record before the reviewing court is rare and requires "exceptional circumstances."  *See Charter Twp. of Van Buren*, 1999 WL 701924, at *4.

To be sure, "[s]upplementation of the administrative record may be appropriate 'when an agency has deliberately or negligently excluded certain documents from the record, or when a court needs 'background' information to determine whether the agency has considered all relevant factors.'"  *S. Forest Watch, Inc. v. Jewell*, 817 F.3d 965, 977 (6th Cir. 2016) (quoting *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, 756 F.3d 447, 465 (6th Cir. 2014)). A "strong showing of bad faith" may also justify supplementation of the record. *Charter Twp. of Van Buren*, 1999 WL 701924, at *4; *see also Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998).  But Plaintiffs have not shown that the Park Service deliberately or negligently excluded certain documents, and Plaintiffs do not allege that the Park Service acted in bad faith.  As the district court observed, Plaintiffs do not allege that any of the materials that they propose be added to the record were presented to the Park Service prior to the time it issued the 2009 FONSI.  It would be strange to say that the Park Service deliberately excluded certain documents that were never presented to it for consideration.

The fact that the record contains evidence addressing the issues Plaintiffs sought to prove with their supplemental material further shows that the Park Service was not negligent when it compiled the 3,005-page administrative record.  Indeed, Plaintiffs cannot demonstrate that the additional photos, maps, and testimony would have provided the court necessary "background"

information to determine whether the Park Service had considered all relevant factors.  As the district court observed, the record—consisting of 3,005 pages of materials—appears to contain materials addressing the issues Plaintiffs claim the additional evidence addresses.  For example, the record already contains evidence that Traverse Lake Road is a "quiet, residential, country road," and cumulative information that "might have supplied a fuller record, but otherwise does not address issues not already there," is not necessary for the court to review the record.  *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986).

Still, Plaintiffs contend that while motions requesting supplementation are rarely granted, "in NEPA cases, like the one at bar, a primary function of the court is to ensure that the information available to the agency includes an adequate discussion of environmental effects and alternatives."  True, but the idea that a special supplementation rule applies to NEPA cases is contrary to our precedent.  *See, e.g.*, *Slater*, 120 F.3d at 638–39; *Latin Ams. for Soc. & Econ. Dev.*, 756 F.3d at 464–65; *Partners in Forestry Co-op., Northwood All., Inc. v. U.S. Forest Serv.*, 638 F. App'x 456, 468–69 (6th Cir. 2015).  Even the case upon which Plaintiffs rely for the proposition that NEPA cases are special acknowledges that "deviation from the record rule, even in NEPA decisions, is limited," and "[c]ourts may . . . consider additional information . . . only when the administrative record is so inadequate as to prevent the reviewing court from effectively determining whether the agency considered all environmental consequences of its proposed actions."  *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d at 7, 15 (2d Cir. 1997).

The 3,005-page record here is not "so inadequate," and, as discussed above, Plaintiffs had an opportunity to raise objections and submit additional evidence during the 2009 public comment period.  They did not, but "[i]f they had, their criticism would have been incorporated in the administrative record for future judicial review."  *Davidson v. U.S. Dep't of Energy*, 838 F.2d 850, 855 (6th Cir. 1998).  In this case, Plaintiffs, not the Park Service, omitted the documents they now seek to add to the record.  Moreover, the documents are cumulative and would not help demonstrate any facts not already shown in the 3,005-page record submitted by the Park Service.  Plaintiffs have not identified any Supreme Court or Circuit precedents that would allow them a do-over by way of introducing cumulative evidence in the district court that

they did not present to the agency.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Latin Ams. for Soc. & Econ. Dev.*, 756 F.3d at 465; *Davidson*, 838 F.2d at 854–56.

## III.

The judgment of the district court is affirmed.